**F I L E D**
United States Court of Appeals
Tenth Circuit

**SEP 4 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

RICK WEBB,

     Plaintiff-Appellee,

v.

ABF FREIGHT SYSTEM, INC., a
corporation,

     Defendant-Appellant,

and

TEAMSTERS LOCAL UNION
No. 17,

     Defendant.

No. 96-1427

Appeal from the United States District Court
for the District of Colorado
(D.C. No. 94-Z-239)

Andrew W. Volin (E. Lee Dale with him on the briefs) of Sherman & Howard,
Denver, Colorado, for Defendant-Appellant.

John R. Olsen of Olsen & Brown, Niwot, Colorado, for Plaintiff-Appellee.

Before **EBEL** and **HOLLOWAY**, Circuit Judges, and **BLACK**,[*] District Judge.

---

[*] The Honorable Bruce D. Black, District Court Judge, District of New

(continued...)

**EBEL**, Circuit Judge.

This case involves a jury's verdict of $112,124 for the appellee on his claim that he was wrongfully fired from his job as a delivery truck driver on trumped up charges after his delivery truck skimmed the underside of some tree branches, and that the real reason for his discharge was retaliation for his union activities. Appellant argues that the verdict should not stand because the appellee failed to prove the elements necessary to his claims of breach of contract and breach of the duty of fair representation. The appellant also challenges numerous discretionary rulings by the district court during the course of the trial. We affirm on all grounds.

## Background[1]

The dispute in this case arose in 1993, when defendant-appellant ABF Freight System, Inc. ("ABF"), fired plaintiff-appellee Rick Webb. ABF alleged

---

[*](...continued)
Mexico, sitting by designation.

[1]Because of the jury's verdict in favor of the appellee, our review of the evidence is presented here in the light most favorable to the appellee. See Wolfgang v. Mid-America Motorsports, Inc., 111 F.3d 1515, 1522 (10th Cir. 1997). This standard of review requires that we accept the jury's factual determinations as long as they are reasonably based on some evidence or the inferences that may reasonably be drawn from such evidence. Id.

that Webb had violated his contractual duty to report immediately "any accident."[2] The question in this case is whether ABF's claim was the true basis for Webb's discharge or merely a pretext for firing a union activist.

1.  Webb's union activities

Webb worked as a truck driver with ABF for more than nine years before he was fired on August 2, 1993.  Webb also was a member of Teamsters Local No. 17,[3] which represents all of ABF's drivers in Colorado and elsewhere, and Webb had been the shop steward for Local 17 at ABF's Fort Collins terminal from the day the company opened its terminal there.

_____

[2]The relevant language from the Teamsters' national contract reads:

> **Accident Reports**
> Any employee involved in any accident or cargo spill
> incident, involving any hazardous or potentially
> polluting product, shall immediately report said accident
> or spill incident and any physical injury sustained.
> When required by his Employer, the employee, before
> starting his next shift, shall make out an accident or
> incident report in writing on forms furnished by the
> Employer and shall turn in all available names and
> addresses of witnesses to the accident or incident. . . .
> Failure to comply with this provision shall subject such
> employee to disciplinary action by the Employer.

National Mater Freight Agreement, for the period of April 1, 1991 through March 31, 1994, art. 16, § 3.

[3]Local 17 originally was a defendant in this case, but Webb agreed to dismiss his claims against the union prior to trial.  Thus, the union is not a party to this appeal.

In his role as shop steward, Webb prosecuted grievances on behalf of himself and other drivers from Fort Collins, including grievances alleging unsafe practices by ABF. Webb also was involved with disputes with ABF management over the use of overweight trucks and a hazardous waste spill at the terminal.

During the winter of 1992-93 one of Webb's grievances involved a dispute over ABF's use of drivers from the Denver terminal to do work in Fort Collins on weekends. Webb secured a grievance award of overtime pay for one Fort Collins driver who had lost weekend work to Denver drivers. However, two weeks later, the Denver leadership of Local 17, including union president Ron Schwab, negotiated a side letter with ABF that effectively reversed the results of the grievance decision. This side letter was negotiated without input from Fort Collins' drivers, and it was adopted by the union before any Fort Collins drivers could comment on it. The dispute over work allocation between the Denver and Fort Collins terminals led to continuing friction between Webb and the Teamsters leadership in Denver, including union president Schwab, whose political support was based in the Denver terminal's drivers.

2. Webb's firing

On the afternoon of July 30, 1993, a Friday, Webb took a full truck out for deliveries, with the first delivery at the Colorado State University Alumni Center ("CSU"). As Webb was backing up to the alumni center, Webb's truck became

- 4 -

entangled with overhanging branches. Webb testified that these branches were no more than 1½- to 2-inches in diameter, and he pulled them out from between his truck and the trailer. At the time, Webb did not notice any damage to the truck or the trailer. After finishing his delivery at the alumni center, Webb continued on his route without making any accident report. Webb returned the truck and trailer to the ABF terminal in Fort Collins at the end of the day, again without making any accident report or any log entry of damage in his vehicle condition log.

Company officials contended that Webb's entanglement with tree branches at CSU caused more than $600 worth of damage, bending the exhaust stack on the tractor and crushing a corner of the trailer. At Webb's subsequent grievance hearings, Company officials introduced a picture of a tree limb measuring four inches in diameter that they contend Webb's truck pulled down. However, during the trial in this case, Webb denied that he hit a branch that size. He also testified that he later returned to CSU to look at the tree branches on the driveway of the alumni center, and he noticed the stump where the pictured four-inch limb had come from. He testified that his truck could not have pulled down that branch because the stump showed that the branch had not been pointed out over the driveway where Webb could have hit it.

On the evening of July 30, 1993, after Webb had left work, ABF's manager at the Fort Collins terminal, Bill Higley, noticed damage to Webb's tractor and

trailer.  Higley took several Polaroid pictures of the vehicle, and he called ABF officials in Salt Lake City and Fort Smith, Arkansas, to report the incident.  At that time, he told ABF officials that Webb was the last driver of the damaged truck, and ABF regional vice president Sid Hatfield told Higley that failing to report an accident was a dischargeable offense.

When Webb returned to work the next Monday, Higley confronted Webb about the damage to the truck and trailer.  Webb told Higley about the tree-skimming incident, and he pointed out that no driver had ever considered such an incident to be subject to the company's rule requiring the reporting of all accidents.[4]  Webb also requested an opportunity to view the damage for himself, and after inspecting the vehicle, Webb provided a handwritten statement about the incident.  Webb's statement indicates that Webb did not notice that the stack on the tractor was askew until Saturday morning, after he had learned from a co-worker that Higley had been taking pictures of the truck.  Webb's statement also indicates that Webb did not notice any damage to the trailer until Monday morning when he was confronted about the incident.  However, nowhere in the

---

[4]There was extensive testimony during the trial from both Webb and his former co-workers that tree-skimming incidents were common for Fort Collins drivers, and that ABF had never required drivers to report such incidents as accidents under the mandatory accident-reporting policy.  One witness testified that it was only after Webb was fired that the company began to require such reports for tree-skimming incidents.

statement does Webb admit responsibility for the damage to the trailer.

When Webb finished writing out this statement, Higley informed Webb that he was fired and he should leave the ABF premises. Higley then began drafting letters to notify Webb formally that he had been discharged, with the sole basis for Webb's firing being Webb's failure to report the tree-skimming incident as an accident.[5]

## 3. Webb's grievance

Immediately after being fired, Webb called Ron Schwab, who was the Local 17 official responsible for handling grievances out of the Fort Collins terminal, and Webb requested that the union challenge his discharge. After commenting that "we knew this was coming," Schwab agreed to file a grievance on Webb's behalf. Schwab also agreed to obtain company documents that Webb said would be helpful for the grievance, as well as to interview one of Webb's co-workers who could testify about the events leading up to Webb's discharge.

---

[5]The pertinent part of ABF's "Letter of Discharge" states:

> On July 30th, 1993, you were involved in an accident which has been judged preventable by the ABF Safety Department. You failed to report this accident. . . .
> In accordance with Article 46 of the Western Area Supplemental Agreements and Article 16 Section 3 of the National Master Freight Agreement, you are hereby discharged for failing to report a preventable accident.

Schwab, however, decided not to call any witnesses for Webb during the grievance hearing, and he failed to obtain any of the documents Webb requested.

The first hearing on Webb's grievance occurred two days after the firing, on August 4, 1993, in Denver before the joint Colorado-Wyoming Longline Grievance Committee, an arbitration panel evenly composed of union and company officials. Schwab focused his arguments during the hearing on Webb's account that the tree-skimming incident at CSU was not a reportable accident in light of the small size of the branches involved and the fact that Webb had not noticed any damage when he was at the scene. Schwab, however, failed to object when an ABF official characterized the branch that Webb had hit as "about eight inches in diameter and about 30 foot [sic] long." Schwab also failed to review the evidence ABF prepared before the hearing, and as a result, he was taken by surprise when ABF introduced a statement by one of Webb's co-workers that detailed ABF's account of the damage to Webb's tractor and trailer.[6] Schwab's failure to review ABF's evidence before the hearing also may have affected his and Webb's ability to raise questions about ABF's alleged tampering with the evidence of damage to Webb's trailer.[7] Finally, despite telling Webb again before

---

[6]Subsequent testimony at the trial demonstrated that ABF's manager, Bill Higley, prepared the co-worker's statement. The co-worker signed the statement two days after Higley wrote it, and four days after Webb's alleged accident.

[7]The photographs presented at Webb's grievance hearing inexplicably show
(continued...)

the grievance hearing that "we knew this was coming," and despite Webb specifically asking Schwab to do so, Schwab did not present Webb's allegation of retaliation – that Webb's firing was prompted by the company's desire to silence his union activities.

The grievance committee deadlocked on the question of whether to reverse ABF's discipline. As a result, the grievance was transferred one week later to the Joint Western Area Committee ("JWAC") in San Diego, an arbitration panel whose voting members were again evenly split between union representatives and company representatives. In the days before this second hearing, Schwab apparently told Webb it wasn't necessary for Webb to be present because no new testimony or evidence would be introduced.[8]

---

[7](...continued)
different kinds of damage to the top right corner of a trailer, with two photographs showing the running light on the trailer still present but a third photograph showing the running light missing. No mention of these discrepancies was made during the grievance hearing.

[8]Schwab disputed Webb's testimony on this point. However, in light of the jury's apparent assessment of Schwab's credibility, we must accept Webb's version of events.

In any event, Schwab's statement about the JWAC proceeding turned out to be incorrect. ABF officials introduced new photographs of the alleged damage to Webb's truck at the second hearing. Also, they offered new testimony as to the specific events on the morning when Webb was fired, implying that Webb knew he had "wrecked" his truck: Rick Porter, ABF's manager for industrial relations, told the JWAC panel that Webb gave his handwritten statement "when Mr. Higley was asking him 'Did you know that you wrecked the tractor?' He said 'Let me tell you about it.'"

Despite his apparent discouragement of Webb's attendance at the JWAC hearing, Schwab told the JWAC panel, "Mr Webb was invited to be present here and apparently has chosen not to be here to testify in his own behalf. The Local Union will do its best with these conditions." Schwab also told the JWAC hearing that "the Union has no problem stipulating to the size of the tree branch. We have seen the tree branch." Schwab made this stipulation despite the fact that the only offer from ABF as to the size of the tree branch was the eight-inch-diameter claim that directly contradicted Webb's account of branches no larger than two inches in diameter. When a panel member asked Schwab whether Webb was aware that any incident that resulted in damage to company equipment was a reportable accident under the contract, Schwab responded, "I'm not Mr. Webb so I don't know exactly what his position would be because he's not here to answer that personally. . . ." In answer to another question, Schwab said, "I don't know why Mr. Webb did the things that he did at that time."

At the conclusion of the hearing, the JWAC panel upheld Webb's discharge. No reason or written decision was issued by the panel.

4. Webb's federal suit

Webb subsequently brought suit in federal court under 29 U.S.C. § 185(a) (also known as § 301 of the Labor Management Relations Act of 1947) in what is commonly referred to as a hybrid § 301/DFR (duty of fair representation) suit.

- 10 -

Webb sued both ABF and Local 17, alleging that ABF had violated the Teamsters contract through a wrongful discharge and that Local 17 had breached its duty to represent him fairly. Webb sought reinstatement, an award of back pay, emotional distress damages, and punitive damages. The union was dismissed out of the case pursuant to a stipulation by Webb prior to the trial. Following a seven-day trial, the jury returned a verdict in favor of Webb against ABF. The jury found that Webb's total economic damages were $112,124, and it allocated $89,699.20 of the damages to ABF.[9] The jury declined to award any damages on Webb's claim of emotional distress.[10]

## 5. Attorney misconduct claim

Following the end of the trial, the court fined Webb's lawyer $757 for conduct it found to be unethical.[11] This matter arose near the end of the trial when Charles Cantrell, the superintendent of ABF's repair shop in Denver, testified about the damage to the tractor and trailer that Webb was driving on the day of

[9]The jury's division of damages – $89,699.20 against ABF and $22,424.80 against Local 17 – represents an 80% to 20% split.

[10]The jury's finding that Webb suffered no emotional distress rendered moot ABF's claim that emotional distress damages are unavailable for a § 301 claim against an employer. As a result, we offer no opinion on that legal question.

[11]Webb filed, but eventually dropped, a cross-appeal to challenge this penalty. The issue remains a live controversy in this case because ABF has asserted that the district court's failure to grant a mistrial on the basis of this conduct was an abuse of discretion.

the accident. On cross-examination, Webb's lawyer attempted to question Cantrell about a statement Cantrell allegedly had made to the lawyer out of court.[12] The court promptly conducted a consultation with the attorneys out of the hearing of the jury in which she announced that the conduct by Webb's lawyer violated the ethical rule against attorney communication with a represented party and she would entertain suggestions as to the appropriate remedy. ABF moved for a mistrial, which the court denied the following day. Instead, the court gave the jury a limiting instruction to disregard any evidence of a telephone conversation between Webb's attorney and Cantrell.

**Discussion**

I. ABF's motion for judgment as a matter of law

This appeal comes to us following the district court's denial of ABF's Rule 50 motion for judgment as a matter of law, or in the alternative, for a new trial. We review de novo a district court's denial of judgment as a matter of law, using the same standard applicable in the district court. See Harolds Stores, Inc. v. Dillard Dep't Stores, Inc., 82 F.3d 1533, 1546 (10th Cir.), cert. denied, 117 S. Ct.

---

[12]It appears that Cantrell called Webb's lawyer in an attempt to avoid the subpoena that Webb's lawyer had served on him. Webb's lawyer told the court during the subsequent hearing on the issue that he received the call without notice and he did not ask any questions of Cantrell during the conversation. Rather, Cantrell spontaneously blurted out the statement at issue.

297 (1996). Despite the breadth of our de novo standard of review, we may upset the jury's conclusion "only if the evidence points but one way and is susceptible to no reasonable inferences supporting the nonmoving party." See Yearous v. Niobrara County Mem. Hosp., 128 F.3d 1351, 1353 (10th Cir. 1997), cert. denied, 118 S. Ct. 1515 (1998). Under this standard of review, we may not "weigh the evidence, pass on the credibility of witnesses, or substitute our conclusions for that of the jury." Id. (quotation omitted).

In support of its claim for judgment as a matter of law, ABF argues that Webb did not establish the elements of a hybrid § 301/DFR claim because: (1) Webb failed to prove that Local 17 breached its duty of fair representation; (2) Webb failed to prove the required level of causal connection in the DFR claim, and (3) Webb failed to prove a breach of contract by ABF. Furthermore, with respect to the question of damages, ABF argues that Webb was not entitled to an award of backpay from ABF for the period after the grievance arbitration hearings. Each of these issues intertwines questions of law with questions of fact. In light of our standard of review, we will discuss the applicable legal standards first before addressing whether the evidence was sufficient.

## A. Elements of a hybrid § 301/DFR claim

Federal labor policy generally extends great deference and finality to the

decision by a labor arbitrator that a company has not violated its collective bargaining agreement in firing an employee. See DelCostello v. International Bhd. of Teamsters, 462 U.S. 151, 163-64 (1983). However, this deference can result in "an unacceptable injustice" when the employee's assertion of his rights under the collective bargaining agreement has been tainted by conduct from his union that breaches its duty of fair representation toward him. See id. at 164 (citing Hines v. Anchor Motor Freight, Inc., 424 U.S. 554 (1976); Vaca v. Sipes, 386 U.S. 171 (1967)). As a result, the Court has explained that,

> [W]hen the union representing the employee in the grievance/arbitration procedure acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation. . . , an employee may bring suit against both the employer and the union, notwithstanding the outcome or finality of the grievance or arbitration proceeding.

DelCostello, 462 U.S. at 164 (citations omitted).

The kind of suit authorized in Vaca, Hines, and DelCostello is a "hybrid" action under § 301 because it combines two conceptually independent causes of action, the first against the company for breach of the contract (a standard § 301 claim) and the second against the union for breach of the duty of fair representation (a claim implied by operation of a union's status under federal law as the sole bargaining representative of the employee). See DelCostello, 462 U.S. at 164. To prevail against his former employer under this hybrid § 301/DFR

- 14 -

cause of action, a discharged worker must prove three elements: (1) Some conduct by the worker's union that breached the duty of fair representation; (2) A causal connection showing that the union's breach affected the integrity of the arbitration process, and; (3) A violation of the collective bargaining agreement by the company. See Hines, 424 U.S. at 568 ("[W]here the union actually utilizes the grievance and arbitration procedures on behalf of the employee, the focus is . . . on whether, contrary to the arbitrator's decision, the employer breached the contract and whether there is substantial reason to believe that a union breach of duty contributed to the erroneous outcome of the contractual proceedings."). The plaintiff in a hybrid § 301/DFR action need not sue both his union and former employer in the same case, and he may choose to seek damages against only one of the potential defendants, but in any event, "the case he must prove is the same whether he sues one, the other, or both." See DelCostello, 462 U.S. at 165.

### B. Local 17's duty of fair representation

In light of a union's position as the sole and exclusive bargaining representative of an employee with his employer, every collective bargaining union has a duty to represent its members fairly in its dealings with management. See DelCostello, 462 U.S. at 164 & n. 14. The scope of this duty in the context of a grievance arbitration proceeding requires that the union "may not arbitrarily

- 15 -

ignore a meritorious grievance or process it in perfunctory fashion." See Vaca 386 U.S. at 191. The Supreme Court has consistently repeated this standard for a DFR claim: "A duty-of-fair-representation claim arises when a union that represents an employee in a grievance or arbitration procedure acts in a 'discriminatory, dishonest, arbitrary, or perfunctory' fashion.'" International Bhd. of Elec. Workers v. Hechler, 481 U.S. 851, 864 n.6 (1987) (quoting Delcostello, 462 U.S. at 164); see also International Bhd. of Elec. Workers v. Foust, 442 U.S. 42, 47 (1979) ("In particular, a union breaches its duty when its conduct is 'arbitrary, discriminatory or in bad faith,' as, for example, when it 'arbitrarily ignore[s] a meritorious grievance or process[es] it in [a] perfunctory fashion.'") (quoting Vaca, 386 U.S. at 190, 191).

In similar vein, this circuit also has reiterated the DFR standard as prohibiting arbitrary, discriminatory, bad faith, or perfunctory conduct. See Foust v. International Bhd. of Elec. Workers, 572 F.2d 710, 714-15 (10th Cir. 1978) (quoting and discussing Vaca and Hines), rev'd on other grounds, 442 U.S. 42 (1979); Nelson v. Holmes Freight Lines, Inc., 37 F.3d 591, 594 & n.4 (10th Cir. 1994) (quoting and discussing Vaca); Young v. United Auto. Workers-Labor Employment & Training Corp., 95 F.3d 992, 998 (10th Cir. 1996) (quoting Vaca, 386 U.S. at 191); Lampkin v. International Union, United Auto., Aerospace & Agric. Implement Workers, No. 96-5212, slip op. at 18 (10th Cir. 1998) (proposed

- 16 -

publish opinion now in circulation).

### 1. "Perfunctory" grievance processing

ABF argues that the duty of fair representation includes only a duty to avoid acting in an arbitrary, discriminatory, or bad faith fashion, but does not include an obligation to avoid acting in a perfunctory manner. Based on the authority cited above, we reject that argument. The district court properly presented to the jury the duty not to act in a perfunctory fashion,[13] and we believe the jury verdict can be upheld on the basis of that duty.

ABF relies principally on the Supreme Court's most recent hybrid § 301/DFR case, in which the Court stated that a union's duty of fair representation is "tripartite," i.e., a union's actions may not be "'arbitrary, discriminatory, or in bad faith.'" See Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 67 & 77 (1991) (quoting Vaca, 386 U.S. at 190)). In its omission of the

---

[13]The text of Jury Instruction No. 10 provides in part:

> In order to prevail against his employer on his claim under 29 U.S.C. § 185, plaintiff Rick Webb must prove . . .
> 2. That the Teamsters Local No. 17 breached its duty of fair representation to the plaintiff by:
> (a) failing properly to process his grievance; and
> (b) acting in a discriminatory, dishonest, arbitrary, or perfunctory fashion.

- 17 -

duty to avoid "perfunctory" conduct, the O'Neill articulation of a union's "tripartite" duties appears to back away from earlier case law stressing that a union is under a legal obligation not to conduct its dealings with its members in a "perfunctory fashion." However, we believe that the prohibition against "perfunctory" conduct remains the law despite its absence from the discussion in O'Neill.

First, the dispute in O'Neill involved claims of union misconduct in the context of contract formation, as opposed to contract administration in a grievance proceeding. See id. at 70. Thus, under the facts in O'Neill there was no need to address the question of a union's duties when a union member seeks to challenge a discharge in a grievance proceeding. Indeed, it would have been dictum in O'Neill for the Court to express any opinion as to the DFR standards for a grievance arbitration in light of the fact that the O'Neill case arose before any grievance arbitration process had been established by the parties.

Second, it is easy to read the Court's earlier cases prohibiting "perfunctory" grievance processing as merely expressing a concrete example of the kind of specific conduct prohibited by the tripartite standard. See Foust, 442 U.S. at 47 (listing perfunctory handling of a grievance as an "example" of union conduct that is "arbitrary, discriminatory or in bad faith"). If "perfunctory" grievance processing is a specific kind of conduct under the tripartite standard, then

O'Neill's failure to mention this particularized DFR standard is immaterial.

In part, any potential doubt as to the applicability of the prohibition against "perfunctory" conduct may arise from the fact that courts generally have failed to give content to the meaning of that term. Indeed, the most this circuit has ever said on the meaning of the prohibition against "perfunctory" conduct is that one union's handling of a member's grievance was not perfunctory when "the record shows a prompt and diligent effort by the union business agent . . . to have appellant's grievance heard and decided by the panel." See Nelson, 37 F.3d at 594 n.4.

The other circuits have similarly had little to say about the meaning of the term "perfunctory." The most detailed explanation comes from the Eighth Circuit, where the court explained that "we construe the Supreme Court's reference in Vaca to the 'perfunctory' processing of a grievance to mean that 'the union acted without concern or solicitude, or gave a claim only cursory attention.'" Beavers v. United Paperworkers Int'l Union, Local 1741, 72 F.3d 97, 100 (8th Cir. 1995) (quoting Curtis v. United Transp. Union, 700 F.2d 457, 458 (8th Cir. 1983)). The Eighth Circuit's construction comports with the standard dictionary definition of "perfunctory." See Websters Third New International Dictionary (Unabridged) 1678 (1986) (defining perfunctory as "characterized by routine or superficiality: done merely as a duty: CURSORY, MECHANICAL . . .

- 19 -

lacking in interest or enthusiasm: APATHETIC, INDIFFERENT").

This is not to say that a union violates its duty of fair representation by mere negligent conduct; carelessness or honest mistakes are not sufficient to impose liability on a union. See United Steelworkers v. Rawson, 495 U.S. 362, 372-73 (1990); Young, 95 F.3d at 997. We need not here define the line between negligent conduct and perfunctory conduct because the evidence was sufficient to allow a jury to find, as it did, that the union conducted this arbitration in such a perfunctory, apathetic, indifferent, and cursory way that Local 17 breached its duty of fair representation.[14] Indeed the evidence was sufficient to support not just a finding of perfunctory conduct, but also conduct by the union that rose to

---

[14]Webb's evidence could have allowed a reasonable juror to reach at least the following conclusions: (1) Local 17 failed to present a grievance claim of retaliation despite Webb's request to do so and despite Schwab's belief that Webb's firing was indeed a case of retaliation; (2) Schwab failed to follow Local 17's regular practice in grievance cases of reviewing company evidence before the arbitration hearings; (3) Schwab affirmatively misled Webb by telling Webb that his presence was not needed at the second grievance hearing in San Diego and that no new evidence or testimony would be allowed; (4) Schwab affirmatively misled the JWAC grievance panel in San Diego when he told the panel members that he did not know why Webb had chosen not to come to the hearing; (5) Schwab disparaged his own union member before the JWAC panel by suggesting that there was no explanation for Webb's conduct in the tree-skimming incident; and (6) Schwab directly contradicted Webb's own account of the incident by accepting the company's claims as to the size of the tree limbs that Webb had hit.

ABF insists these conclusions are contradicted by testimony from Schwab and others. However, this contention misunderstands our standard of review, which must uphold the jury's verdict if any reasonable juror could have ruled as the jury did. See Yearous, 128 F.3d at 1353.

the level of bad faith.  See Young, 95 F.3d at 996 n.1 (noting that bad faith in a DFR claim "requires a showing of fraud or deceitful or dishonest action").

### 2.  Pre-arbitration investigation

Next, ABF argues that the union did not have an obligation to conduct its own investigation of Webb's grievance because Webb undertook to do the investigation himself.  ABF also contends that a union has no legal duty to conduct "some minimal investigation" of a grievance complaint.[15]

In Foust, the Tenth Circuit agreed with other circuits that "the failure to investigate the merits of a grievance could be arbitrary conduct and a breach of a duty."  See Foust, 572 F.2d at 716 (citing De Arroyo v. Sindicato de Trabajadores Packinghouse, 425 F.2d 281 (1st Cir. 1970); Hughes v. International Bhd. of Teamsters, Local 683, 554 F.2d 365 (9th Cir. 1977)).  The amount of investigation required of a union to meet its duty of fair representation depends

---

[15]Jury Instruction No. 17 provides as follows:

> An incomplete investigation of a grievance, or not making every conceivable argument on behalf of the grievant during the grievance procedure, does not violate the union's duty of fair representation unless the union's actions were discriminatory, dishonest, arbitrary or perfunctory.  However, some minimal investigation is required.

At trial, ABF objected to the last sentence of this instruction on the grounds that "there is no minimum investigation threshold under the duty of fair representation cases."

on the circumstances of each case. See Garcia v. Zenith Elecs. Corp., 58 F.3d 1171, 1176 (7th Cir. 1995) (holding that the thoroughness of a union's required investigation depends on the particular case); Evangelista v. Inlandboatmen's Union of the Pacific, 777 F.2d 1390, 1395 (9th Cir. 1985) (same).

In this case, a reasonable juror could have concluded that Local 17 made no serious effort to investigate the facts of Webb's claims. The jury also could, and apparently did, disbelieve the testimony from Schwab that Local 17 had no obligation to conduct its own investigation because Webb allegedly had agreed to undertake the investigation himself. It appears that the jury found Webb more credible than Schwab, and it is not for us to upset that credibility determination. See Yearous, 128 F.3d at 1353. Thus, we find the evidence sufficient to support Webb's contention that Local 17 breached its duty of fair representation by failing to undertake an adequate investigation under the circumstances.

### 3. Judicial estoppel from a grievance arbitration

At the conclusion of the first grievance hearing, the chairman of the grievance committee, a company representative, engaged Webb in the following colloquy:

> Chairman Bradfield: I will now ask the grievant, based
>     on the issue of your failure to report an accident
>     are you satisfied that the Union has represented
>     your position properly?
> Mr. Webb: Yes.
> Chairman Bradfield: Have they introduced all pertinent

information on your behalf in regard to this
defense?

Mr. Webb: Except for the bracket, I don't have anything
else to say.

On the basis of these statements from Webb, ABF now suggests that Webb be precluded from raising any argument that Local 17's representation of his claims fell below the legal standards required of the union.

We reject ABF's argument for two reasons. First, ABF's contention relies on principles of judicial estoppel in which a party's statements or positions in one proceeding prevent him from subsequently raising a contradictory position in the same or related proceedings. The Tenth Circuit has firmly established that it will not be bound by the doctrine of judicial estoppel. See Rascon v. US West Communications, Inc., 1998 WL 223465, at *6 (10th Cir. May 6, 1998) (to be reported at 143 F.3d 1324) (holding that claims inconsistent with others raised in administrative context are not barred by judicial estoppel); United States v. 49.01 Acres of Land, More or Less, Situate in Osage County, Okla., 802 F.2d 387, 390 (10th Cir. 1986).[16] Second, any statements Webb made at the first grievance hearing are not probative as to the quality of Local 17's representation at the

_____

[16]Indeed, it seems likely that ABF cannot succeed on the merits of a judicial estoppel claim because one of the elements of this doctrine is that the party against whom estoppel is asserted must have prevailed on the basis of his contradictory position in the prior proceeding. See 49.01 Acres of Land, 802 F.2d at 390. In Webb's case, he most assuredly did not prevail.

second hearing in San Diego. In light of the fact that many of the DFR breaches that Webb asserted in this case involved the union's conduct at the second hearing, there is no sound reason to prevent Webb from raising his DFR claim. Therefore, the district court properly allowed Webb to present his DFR claim to the jury.

### C. Causal connection between DFR breach and arbitration outcome

In Hines v. Anchor Motor Freight, Inc., the Court held that a plaintiff in a hybrid § 301/DFR case is entitled to relief if he can prove "an erroneous discharge" and a union "breach of duty tainting the decision of the joint committee." 424 U.S. 554, 572 (1976) (emphasis added). The Court stated,

> The union's breach of duty relieves the employee of an express or implied requirement that disputes be settled through contractual grievance procedures; if it seriously undermines the integrity of the arbitral process the union's breach also removes the bar of the finality provisions of the contract.

Id. at 567 (emphasis added). In a later opinion, the Supreme Court reiterated the "seriously undermines" standard. See United Parcel Serv., Inc. v. Mitchell, 451 U.S. 56, 61 (1981). The Court said, "As Hines makes clear, an employee may go behind a final and binding award under a collective-bargaining agreement and seek relief against his employer and union only when he demonstrates that his union's breach of its duty 'seriously undermine[d] the integrity of the arbitral

- 24 -

process.'" Id. (quoting Hines, 424 U.S. at 567); see also Barnett v. United Air Lines, Inc., 738 F.2d 358, 362 (10th Cir. 1984) ("If an employee can establish that his union breached its implied duty of fair representation, then even a binding decision of the [grievance arbitration] board can be set aside if the breach seriously undermined the integrity of the arbitral process.").

In its brief on appeal, ABF contends that the appropriate causation standard in this case is the "but for" standard expressed in Edwards v. International Union, United Plant Guard Workers of America, 46 F.3d 1047, 1051 (10th Cir. 1995). We reject ABF's argument on this point. First, the discussion in Edwards was dicta – the issue to be decided in Edwards was not the definition of the elements of a hybrid § 301/DFR case, but rather the appropriate statute of limitations in such a case. See id. at 1053. As a result, we are not bound by the Edwards panel's articulation. See Bates v. Department of Corrections, 81 F.3d 1008, 1011 (10th Cir. 1996) (holding that one panel is not bound by a prior panel's dicta). Second, in light of the conflict between Edwards and Barnett, we note that this circuit follows the rule that "when faced with an intra-circuit conflict, a panel should follow earlier, settled precedent over a subsequent deviation therefrom." See Haynes v. Williams, 88 F.3d 898, 900 n.4 (10th Cir. 1996).

Having concluded that we must rely on the "seriously undermines" language from Hines and Barnett, we also conclude that there was sufficient

evidence from which a reasonable juror could conclude that Local 17's DFR breach "seriously undermined" Webb's grievance proceedings.[17]  Taken in the light most favorable to Webb, the record shows that Local 17 misled Webb about the second grievance hearing in San Diego and that Local 17 misled the JWAC hearing panel about the nature of Webb's tree-skimming incident and Webb's explanation for his lack of a report to company officials about it.  Indeed, Schwab's concessions allow a reasonable inference that Local 17 deliberately attempted to submarine Webb's case by sending the JWAC panel a message that Local 17 had no faith in Webb's claims and was merely going through the motions on his behalf.  This record meets the causation standard under Hines and Barnett.

ABF, on the other hand, points to the testimony from the chairman of the JWAC board, E. James Roberts, who suggested that Webb's handwritten statement was sufficient evidence alone to uphold his discharge.  Putting aside the dubious validity of a single, non-voting chairman of an arbitration panel testifying as to the state of mind of the entire panel, ABF's argument misunderstands our standard of review in this appeal.  Merely because there is some evidence in the

---

[17]According to Jury Instruction No. 10, to award damages to the plaintiff the jury in Webb's case was required to find "That the breach of its duty of fair representation by Teamsters Local No. 17 seriously undermined the integrity of the grievance proceeding."

record supporting ABF's position will not cause us to upset the jury's verdict. Instead, ABF must show that there is <u>no</u> evidence in the record that would allow a reasonable juror to find for Webb. See <u>Yearous</u>, 128 F.3d at 1351. We believe there is sufficient evidence to support the verdict on the causation element. The fact that there is some contradictory evidence in the record is immaterial.

### D. Breach of contract

During the course of the trial below, Webb presented two different grounds for finding that ABF had breached the collective bargaining agreement. First, Webb argued that ABF's asserted rationale for firing him – that he had failed to report an accident as required by Article 16 of the national contract – was baseless because the tree-skimming incident was not a reportable accident under the custom and practice at the ABF terminal in Fort Collins. Second, Webb argued that ABF's actual reason for firing him was to retaliate for Webb's union activities, which was a violation of Article 21 of the national contract.[18] ABF

---

[18]Article 21 of the <u>National Master Freight Agreement</u> provides as follows:

**Union Activities**
Any employee, member of the Union, acting in an official capacity whatsoever shall not be discriminated against for his acts as such officer of the Union so long as such acts do not interfere with the conduct of the employer's business, nor shall there be any

(continued...)

responds that Webb's tree-skimming incident was a reportable accident under the contract, and therefore, Webb's failure to report was a sufficient basis for the discharge. ABF also argues that Webb should have been precluded from submitting his retaliation claim to the jury because he failed to exhaust it in the grievance arbitration proceeding.

### 1. Failure to report an accident

There is no dispute in this case that Article 16, section 3 of the <u>National Master Freight Agreement</u> requires all employees "involved in any accident" to report that accident "immediately." Instead, the dispute focuses on what is an "accident" under the Teamsters contract. ABF contends that any incident that causes damage to company equipment or to the property of a customer is an "accident." Webb, on the other hand, contends that at least within the experience of ABF employees in Fort Collins and Denver prior to his discharge, brushes with overhanging branches that caused limited damage to ABF's trucks were not "accidents."

It is well-established that when interpreting the terms of a labor contract, a fact-finder is entitled – and indeed, in some cases required – to look to the past practices of the parties and the "common law of the shop" to determine the

---

[18](...continued)
discrimination against any employee because of union membership or activities.

- 28 -

parties' contractual obligations.[19]  See United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 581-82 (1960) (holding that the interpretation of contract terms "is not confined to the express provisions of the contract, as the industrial common law – the practices of the industry and the shop – is equally a part of the collective bargaining agreement although not expressed in it"); National Labor Relations Board v. Northeast Okla. City Mfg. Co., 631 F.2d 669, 676 (10th Cir. 1980) ("Where past practice has established a meaning for language that is used by the parties in a new agreement, the language will be presumed to have the meaning given it by such past practice.") (quotation omitted); see also Madison Hotel v. Hotel & Restaurant Employees, Local 25, __ F.3d __, 1998 WL 278289, at *3 (D.C. Cir. June 2, 1998) (en banc) (upholding an arbitrator's contract interpretation in part because the arbitrator considered "the 'industrial common law' of the hotel business"); Trailways Lines, Inc. v. Trailways, Inc. Joint Council, 807 F.2d 1416, 1423 & n. 12 (8th Cir. 1986) (vacating an arbitrator's award in part because the arbitrator failed to consider the "common law of the shop").  This is especially the case when a disputed contract

_____

[19]Jury Instruction No. 8 reflects this understanding of the law.  It states,

> The interpretation of a contract by the parties, as shown by their conduct before any dispute arose between them, is one of the best indications of their intent.

- 29 -

term is ambiguous on its face and no other language in the contract provides a basis for construing the term. See International Bhd. of Elec. Workers, Local Union No. 611 v. Public Serv. Co., 980 F.2d 616, 617-19 (10th Cir. 1992) (upholding an arbitrator's interpretation of ambiguous contract terms in light of the arbitrator's consideration of the parties' past practices).

In Webb's case, he presented extensive testimony from co-workers and an ABF maintenance worker that tree-brushing incidents were common, including incidents that resulted in minor damage to ABF tractors and trailers. In no case were these incidents treated as reportable accidents, and the witnesses testified that they could not recall anyone being fired for failing to report these incidents. In light of this testimony, a reasonable juror could conclude that the "common law of the shop" at ABF's Fort Collins and Denver terminals was that minor tree-skimming incidents were not subject to the mandatory reporting provision of the contract. As a result, a reasonable juror could conclude that ABF breached the contract by firing Webb for an incident that was not a reportable accident. Therefore, ABF is not entitled to judgment as a matter of law on its reportable-accident claim.

### 2. Retaliation for union activities

ABF contends that Webb should have been barred from presenting his retaliation claim to the jury because he failed to raise the claim during the

grievance proceedings. This argument, however, founders on Webb's proof of a breach of Local 17's duty of fair representation.

As the Supreme Court explained in Hines, a union's DFR breach "relieves the employee of an express or implied requirement that disputes be settled through contractual grievance procedures." Hines, 424 U.S. at 567. This circuit has applied the non-exhaustion rule in several cases. See, e.g., Aguinaga v. United Food & Commercial Workers Int'l Union, 993 F.2d 1463, 1472 (10th Cir. 1993) ("[I]n determining whether Plaintiffs are required to exhaust, the relevant inquiry is whether the Union . . . breached its duty of fair representation."); United Food & Commercial Workers Local 7R v. Safeway Stores, Inc., 889 F.2d 940, 945 (10th Cir. 1989) ("[I]f the union refuses to press or only perfunctorily presses the individual's claim, or otherwise acts arbitrarily, discriminatorily, or in bad faith, then the union has breached its duty of fair representation and . . . the employee has 'exhausted' his or her remedies under the collective bargaining agreement.") (quotation and citations omitted). Thus, when a union member proves that his or her ability to prosecute a particular breach of contract claim against his employer has been "seriously undermined" by the union's failure to represent him or her adequately in grievance proceedings, the union member has fulfilled the exhaustion requirement. Here, it was not error for the district court to present Webb's retaliation claim to the jury because Webb offered sufficient

evidence from which a reasonable juror could have concluded that having specifically requested the union to raise the retaliation issue, Webb's claim was seriously undermined by Local 17's actions in declining to raise that issue.

ABF also contends that as a matter of law Webb could not prove retaliation because he failed to show that the company official who made the decision to fire Webb – which ABF contends was Sid Hatfield – was aware at the time of Webb's protected union activities. ABF's argument is based on its premise that Hatfield did not know that it was Webb who had caused the damage that terminal manager Bill Higley had reported. However, in light of Higley's initial report to ABF headquarters that Webb was the last driver of the damaged truck, a reasonable juror could have concluded that ABF was aware of Webb's identity at the time. Therefore, ABF is not entitled to judgment as a matter of law on Webb's retaliation claim.

E.  Allocation of damages between union and employer

When allocating the amount of money damages in a hybrid § 301/DFR case, "[t]he governing principle . . . is to apportion liability between the employer and the union according to the damage caused by the fault of each." Vaca v. Sipes, 386 U.S. 171, 197 (1967); Lampkin v. International Union, United Auto.,

Aerospace & Agric. Implement Workers, No. 96-5212, slip op. at 7 (10th Cir. 1998) (proposed publish opinion now in circulation) (quoting Vaca, 386 U.S. at 197-98).  In light of this principle, we have held that the apportionment of damages "must serve the following purposes: (1) damages must be apportioned according to each party's fault, (2) the union must be held responsible for any increases in the employee's damages, which were caused by the union, and (3) the employee must be made whole."  Aguinaga v. United Food & Commercial Workers Int'l Union, 993 F.2d 1463, 1476 (10th Cir. 1993) (quotations and citations omitted).

In Webb's case, the jury was instructed in accordance with this law,[20] and the jury determined that Webb had suffered total economic damages of $112,124. The jury then allocated $22,424.80 of the damages to Local 17 and $89,699.20 to ABF.  This allocation suggests that the jury found that Local 17 was 20 percent at

---

[20]Jury Instruction No. 23 provides as follows:

> You must apportion any award of damages between the employer and the union according to the damages caused by the fault of each.  Damages attributable solely to the breach of the National Master Freight Agreement by ABF Freight Systems, Inc. should not be charged to Teamsters Local Union No. 17, and increases in those damages caused by Teamsters Local Union No. 17's failure to fairly represent Rick Webb should not be charged to the employer.  The combined amount of these damages should make Rick Webb whole.

fault while ABF was 80 percent at fault.

ABF argues that its damages should have been capped as a matter of law to those wages that Webb lost prior to the grievance proceedings and that the district court erred in giving the jury its proportionate fault instruction. We reject this argument because it carries forward ABF's mistaken argument as to the causation standard in a DFR claim.

ABF contends that all of the economic damages Webb incurred after the grievance hearings are attributable to Local 17 because "but for" the union's DFR breach Webb would have prevailed in the grievance hearings and he would have been reinstated to his job. However, Local 17's DFR breach need not have been the "but for" cause of Webb's subsequent economic damages; instead, Webb only needed to prove that Local 17's actions "seriously undermined the integrity of the arbitration proceedings." See Hines v. Anchor Motor Freight, 424 U.S. 554, 567 (1976). In light of this standard, it is logically possible for a jury to assess damages against an employer based on proportionate fault that includes damages incurred after the date of the flawed grievance hearing. A proportionate fault system of allocating damages ensures that the "primary wrongdoer" shoulders an appropriate burden, especially when an allocation of damages based on the grievance arbitration date would shift a disproportionate amount of damages onto the party that was less at fault. See Aguinaga, 993 F.2d at 1476. Furthermore,

*Aguinaga* directly contradicts ABF's claim here that a chronological allocation of damages based on the date of Webb's grievance hearing was the required method of apportionment: "[W]e hold that the hypothetical arbitration date method [of allocating damages] is not required in every hybrid case . . . ." Id. at 1477. Thus, ABF is not entitled to judgment as a matter of law on its allocation of damages claim.

## II. ABF's motion for a new trial

In addition to its request for judgment as a matter of law, ABF moved for a new trial in light of various procedural decisions by the court that ABF argues were in error. We review the denial of a motion for a new trial for an abuse of discretion, and we may reverse the district court "only if [it] made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." See Weese v. Schukman, 98 F.3d 542, 549 (10th Cir. 1996). Furthermore, under Fed. R. Civ. P. 61, a party is entitled to a new trial only if the alleged error "affect[ed] the substantial rights of the parties."

## A. Attorney Misconduct

ABF contends that Webb's lawyer, John R. Olsen, committed an ethical breach in communicating with ABF's maintenance supervisor Charles Cantrell at

a time when Olsen knew that Cantrell was a management representative for ABF. ABF argues that this ethical breach caused such prejudice to ABF's substantial rights that the district court's curative instruction was insufficient. As a result, ABF asserts that the district court abused its discretion in failing to order a new trial.

The applicable Rule of Professional Conduct in Colorado provides,

> In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

Colo. R. Prof. Conduct 4.2. We are not convinced that Olsen's conduct with respect to Charles Cantrell ran afoul of Rule 4.2 because he did not initiate the communication with Cantrell and he did not ask any questions of Cantrell during their brief telephone conversation. Cantrell blurted out his claim – that he did not know anything about Webb's case – without any prompting from Olsen. Thus, Olsen's attempt to raise Cantrell's statement during cross-examination may not have been inappropriate.

In any event, the district court promptly gave the jury a curative instruction, advising them to disregard this portion of the examination. Even if it was improper for Olsen to have asked the question, it was adequately addressed by the district court, and we see no error here that would render the failure to grant a

- 36 -

new trial an abuse of discretion.

## B.  Evidentiary Rulings

ABF contends that it is entitled to a new trial in light of various evidentiary decisions during the trial.  Such rulings generally are committed to the very broad discretion of the trial judge, and they may constitute an abuse of discretion only if based on an erroneous conclusion of law, a clearly erroneous finding of fact or a manifest error in judgment.  See Cartier v. Jackson, 59 F.3d 1046, 1048 (10th Cir. 1995).  Under this standard of review, we must "give deference to the district court's evidentiary rulings."  Id.  Furthermore, if we find an erroneous evidentiary ruling, ABF would be entitled to a new trial only when the error affected the party's substantial rights.  See Hinds v. General Motors Corp., 988 F.2d 1039, 1049 (10th Cir. 1993).

### 1.  Other discipline against Webb

Before the trial began, the district court ruled on a motion in limine that the only evidence of company discipline against Webb that would be admitted during the trial was evidence concerning events during the nine months before Webb was fired.  The court based this limitation on the provisions of the collective bargaining agreement that prevent an employer from considering multiple disciplinary incidents outside a nine-month window and the fact that ABF's basis

for firing Webb was solely Webb's failure to report the incident at CSU.

ABF challenges the district court's ruling on the grounds that Webb was allowed to introduce evidence to support his claim of retaliation. ABF contends that because Webb was allowed to claim retaliation, ABF should have been allowed to present evidence of Webb's disciplinary record going farther back than nine months.

ABF's argument is unpersuasive because of its faulty premise that Webb opened the nine-month door with his retaliation claim. First, Webb's retaliation evidence – i.e., his testimony about grievances he had filed and complaints he had registered – all involved his conduct within nine months of his discharge. Second, ABF affirmatively denied having fired Webb as a result of his prior record of accidents. ABF has consistently insisted that the sole basis for the discharge was Webb's failure to report the incident at CSU. As a result, nothing about Webb's prior work history was relevant to the company's justification. Therefore, it was not an abuse of discretion to exclude ABF's evidence of Webb's prior discipline.

### 2. Exhibits of grievance arbitration decisions

During the course of its case-in-chief, ABF called one of its executives to testify about its interpretation of contract provisions that allow an employer to fire a worker who fails to report an accident even if the worker has no prior

history of company discipline or other accidents. The executive testified that there were two arbitration precedents from other states which upheld company discharges for failing to report an accident. When ABF sought to introduce exhibits of these grievance decisions, the district court sustained Webb's objection to the exhibits. Nevertheless, the court allowed ABF to present the substance of the decisions through the testimony of ABF's executive. ABF has failed to show how it was prejudiced by the district court's decision not to allow introduction of the actual decisions, given that the substance of the grievance decisions was presented to the jury through the testimony of ABF's executive.

### 3. Evidence of Webb's NLRB complaint

During ABF's cross-examination of Webb, ABF attempted to introduce evidence that Webb filed an unfair labor practice charge against ABF with the National Labor Relations Board (NLRB) prior to filing the instant federal suit, claiming that his discharge was in retaliation for his union activities. Because Webb withdrew his NLRB charge after preliminary investigation, ABF sought to argue that Webb did not believe his retaliation claim had merit. The district court excluded this evidence as not relevant because there could have been many reasons for Webb's decision not to pursue his NLRB charge, including difficulties in his divorce and responsibility for his children. We find no abuse of discretion

in the district court's decision to exclude the NLRB evidence.

### 4.  Excerpts of Webb's deposition testimony

At the close of all the evidence in this case, ABF sought to introduce blown-up reprints showing excerpts from Webb's pre-trial deposition.  These exhibits illustrated various portions of Webb's deposition testimony that ABF contends contradicted Webb's testimony at trial.  The district court excluded the exhibits on the grounds that the jury had heard the deposition testimony during ABF's efforts to impeach Webb on cross-examination.

We find no abuse of discretion in the district court's decision.  Our own review of the proffered excerpts confirms the implication that the exhibits were merely cumulative and offered nothing new.  In addition, because ABF failed to identify any contradictory statements in the proffered deposition excerpts that were not already brought out during ABF's cross-examination of Webb, we can find no prejudice.

### 5.  Emotional distress evidence

The district court allowed Webb to present evidence of his emotional distress.  ABF now argues that the court abused its discretion by admitting this evidence because ABF contends emotional distress damages are not available against an employer in a § 301 case.

We need not reach ABF's substantive argument, however, because the jury

found no basis for awarding emotional distress damages and refused to award any money on that claim. Thus, there was no prejudice to ABF from the admission of the emotional distress evidence. ABF argues that this evidence "likely" influenced the jury's verdict on the primary liability issues as well as on the jury's allocation of fault between ABF and Local 17. However, the district court instructed the jury that it could not award emotional distress damages unless it first found that Webb's case involved "extreme and outrageous misconduct" and that he had suffered "severe emotional distress." We presume the jury followed the court's instruction to disregard the emotional distress evidence in the absence of these findings. See United States v. Castillo, 140 F.3d 874, 884 (10th Cir. 1998) ("A central assumption of our jurisprudence is that juries follow the instructions they receive.").

### 6. Hearsay statements by Schwab

During the course of Webb's direct testimony, he discussed Schwab's reaction to the news that ABF had fired Webb. Webb testified over ABF's hearsay objection that Schwab had said, "We knew this was coming," indicating that Schwab felt Webb's firing came in reaction to Webb's union activities. Prior to eliciting this testimony, the district court instructed the jury on the definition of hearsay and on Webb's stipulation that the Schwab statement was non-hearsay

- 41 -

because it was not offered to prove the truth of Webb's claim that his firing was retaliatory. ABF contends that it was an abuse of discretion to admit this testimony because the only purpose for offering Schwab's statement was to prove the truth of the matter asserted, i.e., that Webb was the victim of retaliation.

We find no abuse of discretion because we agree with the district court that Webb's testimony about Schwab's statement was not hearsay. Although Schwab's statement could have been interpreted as suggesting that ABF actually had retaliated against Webb, the district court properly instructed the jury not to consider the statement for that purpose. Instead, Schwab's statement was probative of Schwab's own state of mind and his awareness of Webb's desire to raise a retaliation claim, both of which were relevant to Webb's claim that Local 17 breached its duty of fair representation in failing to raise his retaliation claim. Thus, the court did not abuse it discretion in admitting the testimony.

## C. Jury Instructions

ABF challenges a series of decisions by the district court admitting or excluding certain jury instructions. We review a trial court's decision on whether to give a particular instruction for abuse of discretion. See Thomas v. Denny's, Inc., 111 F.3d 1506, 1509 (10th Cir.), cert. denied, 118 S. Ct. 626 (1997). Within the scope of this review, we will find an abuse of discretion if the challenged

instruction incorrectly states the governing law. See id. Furthermore, "[n]o particular form of words is essential if the instruction as a whole conveys the correct statement of the applicable law." Considine v. Newspaper Agency Corp., 43 F.3d 1349, 1365 (10th Cir. 1994) (quotation omitted). Finally, we must decide whether the jury "could seriously have been misled in its understanding of the issues and law applicable to the case before it." United States v. Laughlin, 26 F.3d 1523, 1528 (10th Cir. 1994).

ABF argues that two of the instructions given to the jury incorrectly stated the applicable law. First, ABF repeats its contention that Jury Instruction No. 10[21] incorrectly allowed the jury to find a breach of Local 17's duty of fair representation based on "perfunctory" conduct. Second, ABF also contends that Jury Instruction No. 17[22] incorrectly allowed the jury to find a DFR breach if Local 17 failed to conduct at least a "minimal investigation." Both of these claims, however, rely on legal arguments rejected in our discussion, in Part I.A above, on the substantive scope of a hybrid § 301/DFR case. Because these instructions accurately stated the law, there was no abuse of discretion in overruling ABF's objections to them.

ABF also challenges the district court's refusal to give five of its proposed

---

[21]The relevant text of Jury Instruction No. 10 is provided in footnote 13.

[22]The text of Jury Instruction No. 17 is provided in footnote 15.

jury instructions.  We have reviewed each of ABF's claims, and in each instance, the language proposed by ABF either was adequately conveyed by the instructions the court did give, constituted an incorrect statement of the law, or was without evidentiary support.  Therefore we find no abuse of discretion.

### D.  Special verdict form

In addition to its challenges to the district court's jury instructions, ABF also raises two challenges to the wording of the special verdict form given to the jury.  We will review the language of a special verdict form with the same abuse of discretion standard that we apply to jury instructions.  See United States v. Reed, Nos. 97-10053, 97-10072, __ F.3d __, 1998 WL 372749, at *2 (9th Cir. July 7, 1998).

ABF's first contention points to the wording of the initial question in the special verdict form, which asks the jury to decide whether Webb was "wrongfully discharged."  ABF argues that the phrase "wrongfully discharged" incorrectly characterizes the legal requirement of finding that Webb's firing breached the collective bargaining agreement.  We see no mischaracterization in the use of the phrase "wrongfully discharged" instead of "breached the contract." Furthermore, we note that Jury Instruction No. 10 ensures that the jury was aware that in order to find that Webb was "wrongfully discharged," it must find that

"ABF Freight Systems Inc. violated the National Master Freight Agreement by terminating Webb from his employment without 'just cause' or other valid reason under said contract." As a result, we find no abuse of discretion in the special verdict form's use of the words "wrongfully discharged."

ABF next contends that the special verdict form incorrectly failed to set forth a "but for" causation standard for Webb's DFR claim. However, as we discussed above in Part I.C., the case law does not require a "but for" causation standard in a DFR case.

### E. Excessive damages

ABF's final basis for claiming a right to a new trial is a rearticulation of its earlier argument on the allocation of damages. ABF contends that the jury's award of $89,699.20 in damages against ABF was "plainly excessive" because this amount includes lost wages incurred by Webb after the date of the grievance hearings. However, as discussed above in Part I.E., the jury properly allocated damages on the basis of its findings of proportional fault. As a result, we reject ABF's related claim that the damages are excessive.

### Conclusion

In this case, a properly instructed jury having heard seven days of testimony

found that Teamsters Local 17 had breached its duty of fair representation to Rick Webb and that this breach seriously undermined Webb's ability to defend his rights under the collective bargaining agreement after ABF Freight System had wrongfully terminated his employment. We have found no errors of law or abuse of discretion in the proceedings below, and therefore, we AFFIRM.