**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 2 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

No. 01-8090

DEREK A. FREDETTE,

    Defendant - Appellant.

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 01-CR-052-1J)**

Submitted on the briefs:[*]

Susan L. Foreman, Boulder, Colorado for the Defendant-Appellant.

Matthew M. Mead, United States Attorney, and Lisa E. Leschuck, Assistant United States Attorney, Cheyenne, Wyoming for the Plaintiff-Appellee.

Before **EBEL**, **PORFILIO** and **LUCERO**, Circuit Judges.

**LUCERO**, Circuit Judge.

---

[*]At the parties' request, the case is unanimously ordered submitted without oral argument pursuant to Fed. R. App. P. 34(f) and 10th Cir. R. 34.1(G).

Consumers love coupons; this case is about coupons. Having duped numerous automobile dealerships into spending millions of dollars to purchase enticing "fuel vouchers" to provide to their customers—vouchers that proved to be virtually worthless—Derek A. Fredette was convicted of conspiracy to commit mail and wire fraud under 18 U.S.C. § 371, mail fraud under 18 U.S.C. § 1341, and wire fraud under 18 U.S.C. § 1343. He appeals his conviction and sentence. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), and affirm.

## I

On April 28, 2000, Fredette incorporated National Fuels Corporation ("NFC"), a company that sold fuel vouchers to automobile dealerships. Although NFC was physically located in Holiday, Florida, NFC's promotional materials falsely claimed that it was based in Seattle, Washington and had offices in Chicago, Toronto and Munich. Elaborate mail and telephone routing systems were developed to give the impression that NFC was in fact based in Seattle, and employees were instructed to speak and act as though they were in Seattle. Fredette and his key associates used aliases to hide their true identities, and Fredette himself used at least five different false names.

NFC employed twelve to fourteen telemarketers, who telephoned automobile dealerships and other businesses nationwide, marketing to them fuel

vouchers at substantially discounted prices. Vouchers were to be provided by the dealerships to their customers as a sales incentive. Fredette prepared a script for these telephone calls. During the course of the telephone conversations, NFC employees falsely stated that NFC maintained close relationships with major oil companies that were offering the vouchers at a substantial discount in order to establish brand loyalty. NFC employees also advised dealerships that NFC was a member of the North American Fuels Marketing Association, actually an organization Fredette created that consisted solely of an answering service in Washington, D.C.

In order to collect on their vouchers and receive reimbursement for gasoline purchases, customers were required to complete a registration card and send it to NFC. NFC's program was designed so that, upon receipt of the cards, NFC would issue each customer a letter containing a "PIN number . . . to put on their receipts when they mailed them in to get their gas refunds." (7 R. at 251.) This letter directed customers to write assigned PIN numbers on their receipts for gasoline purchases and return the receipts to NFC for reimbursement.

While registration cards noted that they must be returned by registered mail, NFC employees informed dealers that cards sent through certified mail would be accepted, although they would take longer to process. Despite assurances by NFC employees to the contrary, vouchers that were not submitted

through registered mail were never reimbursed. Under NFC's program, reimbursements were supposed to be issued within ten working days after NFC received receipts for gasoline purchases. NFC required registration cards to be submitted unfolded, which, due to the odd size of the card, required a special envelope. NFC's stated purpose for this requirement was that each reimbursement card had a special bar code at the bottom that could not be read if the card was folded. In reality, these bar codes served no purpose and were not used to process the reimbursement cards.

On the rare occasions when customers were actually reimbursed, checks were sent out in envelopes bearing a picture of a missing child and providing phone numbers for the Center for Missing and Exploited Children. Letters containing the PIN number were also sent out in these envelopes. Nothing on the envelope indicated that it was sent from NFC or contained a letter with a PIN number or a reimbursement check—presumably, in order to cause people to discard the letters as "junk mail."

Although NFC sold approximately 30,000 to 35,000 vouchers to car dealers, NFC issued only 613 redemption checks. Customers who threatened legal action were more likely to be reimbursed, as were customers of dealerships who had the potential to reorder vouchers. Of the $2,045,991.54 received from dealerships and deposited in a bank account by NFC, approximately $10,478 was

used to reimburse customers. Fredette transferred $957,500 to a trust controlled by his ex-wife, who had no known connection with NFC.

Fredette was indicted for conspiracy along with two co-conspirators. Fredette was also indicted for mail fraud and wire fraud. The other two co-conspirators pled guilty and testified against Fredette. At trial, Fredette defended NFC's practices by referring to the concept of "breakage," which he claimed was fundamental to the rebate industry. "Breakage" is a concept that relies on the fact that "only a relatively small percentage of people that get a coupon or rebate actually use it or, frankly, jump through the hoops that are associated." (7 R. at 226.) Fredette sought to call an "expert witness" who would testify about the concept of breakage, but the district court held that the proposed testimony did not satisfy the requirements of the Federal Rules of Evidence.

The jury found Fredette guilty on all counts, and he was sentenced to sixty months' imprisonment on the conspiracy count and twenty-four months on the other two counts, to run concurrently with each other but consecutively to the conspiracy sentence. The court also sentenced Fredette to three years' supervised release and ordered him to pay special assessments and restitution. We consider his direct appeal.

## II

As his first argument, Fredette contends that the district court erred in

refusing to admit expert testimony from James D. Feldman. "We review the district court's decision to admit expert testimony for abuse of discretion, and we reverse a decision only if it is 'manifestly erroneous.'" United States v. McPhilomy, 270 F.3d 1302, 1312 (10th Cir. 2001) (quoting General Elec. Co. v. Joiner, 522 U.S. 136, 141–42 (1997)). The law "grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 142 (1999).

Rule 702 sets forth the standard for admission of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993), the Supreme Court interpreted this rule in the context of scientific evidence, holding that Rule 702 "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." These two requirements of reliability and relevance were extended by Kumho Tire, 526 U.S. at 141, to all expert testimony. In reviewing the district court's exclusion of Feldman's testimony, therefore, we

consider whether the proposed testimony was reliable or relevant to the instant case.

In an effort to rebut the government's assertion that his "rebate program" was specifically designed to pay virtually no rebates, Fredette sought to submit testimony from Feldman, a "marketing expert who makes himself available for counseling and consulting and trial testimony." (10 R. at 950.) Feldman intended to compare the "breakage rules and requirements" of Fredette's program to other programs, based upon his purported knowledge of standards in the rebate industry. (10 id. at 937.)

With regard to the first Daubert factor, the district court found Feldman's testimony to be unreliable. Feldman's proposed testimony might have established that other rebate programs took into account the concept of "breakage," i.e., that not all rebate recipients would collect on the rebate. Feldman admitted at the Daubert hearing, however, that the NFC program was unusual and that he had never before encountered a rebate program like NFC's where $500 or more was offered over a twelve-month period. In light of the unusual nature of Fredette's program, Feldman conceded that applying "an industry standard doesn't really work," and proposed to evaluate the program based on whether the rules and regulations "were adhered to or not." (10 id. at 939, 945.) Feldman's alleged expertise with regard to other programs gave him no special insight into whether

NFC adhered to its rules and regulations.  Evidence at trial established that the rules were not in fact adhered to, and Feldman could not have rebutted this testimony by describing other rebate programs with which he was familiar.

Fredette argues on appeal that the district court failed to appreciate that Feldman's proposed testimony was based on "personal knowledge or experience," rather than scientific evidence.  (Appellant's Br. at 17.)  Under Kumho Tire, a district court "may focus upon personal knowledge or experience."  526 U.S. at 150.  Kumho Tire goes on to state, however, that "[o]ur emphasis on the word 'may' reflects Daubert's description of the Rule 702 inquiry as a flexible one." Id. (quotation omitted).  Moreover, a witness "relying solely or primarily on experience" must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  Fed. R. Evid. 702 advisory committee's note.  In the instant case, Feldman's "personal knowledge or experience" related only to other rebate programs, and would not have enabled him to establish whether the rules and regulations of the NFC program "were adhered to or not" under his proposed methodology.  (10 R. at 945.)

Feldman never explained why his personal experience was a sufficient basis for his opinion.  Accordingly, Feldman's proposed testimony did not "rest[] on a reliable foundation" as required by Kumho Tire, 526 U.S. at 141 (quotation

omitted), and would not have "assist[ed] the trier of fact" as required by Rule 702. We conclude that the district court's decision that Feldman's testimony was unreliable was not an abuse of discretion.

With regard to the second Daubert factor, relevance, Feldman's proposed testimony did not deal with matters outside the everyday knowledge of a typical juror. This circuit has held that, as stated in the Advisory Committee Notes to Rule 702,

> [t]here is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.

Corneveaux v. CUNA Mut. Ins. Group, 76 F.3d 1498, 1504 (10th Cir. 1996) (quoting Fed. R. Evid. 702 advisory committee's note). According to the district court, the issues that Feldman would deal with were not "rocket science," and did not require the testimony of an expert. (10 id. at 958.)

Most of the jurors in the instant case, as the district court explained, were familiar with rebate programs and how they work, and were able to draw their own conclusions about such programs. The concept of "breakage," moreover, was not so complicated as to require expert testimony. According to the district court, a reasonable juror would intuitively understand Fredette's argument that rebate programs typically work on the assumption that not everyone will go

through all the tedious steps required to obtain a rebate. This conclusion of the district court was not manifestly erroneous.

We hold that the district court's decision to exclude Feldman's testimony was not an abuse of discretion. Feldman's proposed testimony was both unreliable and irrelevant. Thus, neither Daubert requirement was satisfied. Feldman had no adequate basis for comparing the NFC program to other rebate programs, and he would have added nothing to the trial that a juror could not understand on the basis of common sense.

**III**

Fredette's next two claims concern the instructions given to the jury by the district court. "We review the jury instructions de novo to determine whether, as a whole, the instructions correctly state the governing law and provide the jury with an ample understanding of the issues and applicable standards." United States v. Wittgenstein, 163 F.3d 1164, 1168 (10th Cir. 1998). "The instructions as a whole need not be flawless, but we must be satisfied that, upon hearing the instructions, the jury understood the issues to be resolved and its duty to resolve them." Medlock v. Ortho Biotech, Inc., 164 F.3d 545, 552 (10th Cir. 1999).

**A**

Fredette first argues that the district court erred by failing adequately to define the terms "scheme or artifice to defraud" and "material" representations as

elements of the crimes with which he was charged. (Appellant's Br. at 21.) This claim stems from the district court's refusal to tender Fredette's proposed Instructions 1 and 3 to the jury. While we consider the instructions as a whole de novo to determine whether they accurately informed the jury of the governing law, the district court's decision to give a particular jury instruction is reviewed for abuse of discretion. McPhilomy, 270 F.3d at 1310. "[N]o particular form of words is essential if the instruction as a whole conveys the correct statement of the applicable law." Webb v. ABF Freight Systems, Inc., 155 F.3d 1230, 1248 (10th Cir. 1998) (quotation omitted).

Fredette's proposed Instruction 1 defined the phrase "scheme or artifice to defraud" as "deliberate conduct intended or or [sic] reasonably calculated to deceive persons of ordinary prudendce [sic] and comprehension." (2 R. Doc. 64.) Proposed Instruction 3 stated that "[i]n order to prove fraud, the government must show that a person of ordinary prudence would rely on a representation or deception in making a decision about an important matter or transaction." (2 id.) Thus, both instructions referred to a person or persons of "ordinary prudence" as the benchmark for assessing whether a particular deception constituted fraud.

Fredette objected to the court's refusal to tender his proposed Instructions 1 and 3, arguing that these instructions made it clear that the jury needed to consider the impact of Fredette's representations on a person of ordinary prudence

and comprehension.  Fredette is correct that, in order to prove a scheme to defraud, "the government must show conduct intended or reasonably calculated to deceive persons of ordinary prudence or comprehension."  United States v. Janusz, 135 F.3d 1319, 1323 (10th Cir. 1998) (quotation omitted).  We have not mandated, however, that these exact words appear in the district court's instructions to the jury.  See Webb, 155 F.3d at 1248 (explaining that no particular form of words is required).

Rather than tender Fredette's proposed Instructions 1 and 3, the district court offered instructions modelled after Kevin F. O'Malley et al., Federal Jury Practice and Instructions (5th ed. 2000).[1]  Instruction 29, describing the wire fraud charge, stated:

> [F]or the crime of using a wire communication in interstate commerce . . . , for the purpose of executing and attempting to execute a scheme and artifice to defraud, and for obtaining money by means of false and fraudulent pretenses, representations, and promises . . . the United States must prove the following . . . elements beyond a reasonable doubt:
> > *One*: The defendant . . . knowingly devised or knowingly participated in a scheme or artifice to defraud as detailed in the . . . Indictment;
> > *Two*: The representations or promises were material, that is, it would <u>reasonably</u> influence a person to part with money or property;
> > . . . .

---

[1] Instruction 29 was taken from O'Malley et al., <u>supra</u>, at §47.03 and §47.07.  Instruction 33 was taken from <u>id.</u> §47.03, and Instruction 35 was lifted word-for-word from <u>id.</u> §47.13.

(3 R. Doc. 90 (emphasis added).)   Instruction 33 included similar language to describe the mail fraud charge:

> [F]or the crime of using the mails to further a scheme or plan to defraud . . . the United States must prove the following . . . beyond a reasonable doubt:
> *One*: The defendant . . . knowingly devised or knowingly participated in a scheme or artifice to obtain money by means of false or fraudulent pretenses, representations, or promises as detailed in the . . . Indictment;
> *Two*: The representations or promises were material, that is, it would <u>reasonably</u> influence a person to part with money or property;
> . . . .

(3 R. Doc. 90 (emphasis added).)  Finally, Instruction 35 provided:

> The term "false or fraudulent pretenses, representations or promises . . ." means a statement or an assertion which concerns a material or important fact or a material or important aspect of the matter in question and that was either known to be untrue at the time that it was made or used, or that it was made or used with reckless indifference as to whether it was, in fact, true or false, and made or used with the intent to defraud.  <u>A material fact is a fact that would be of importance to a reasonable person</u> in making a decision about a particular matter or transaction.

(3 R. Doc. 90 (emphasis added).)

Thus, Instructions 29 and 33 made clear that material representations or promises are those that "would <u>reasonably</u> influence a person to part with money or property."  (3 R. Doc. 90 (emphasis added).)  Instruction 35 further clarified that "[a] material fact is a fact that would be of importance to a <u>reasonable person</u> in making a decision about a particular matter or transaction."  (3 <u>id.</u> (emphasis

- 13 -

added).)  The district court's instructions therefore specified that materiality was to be considered in reference to what a reasonable person would consider important.  This language adequately conveyed to the jury that whether a representation is fraudulent depends on what impact it would have on a person of ordinary prudence and comprehension.[2]  Accordingly, the instructions in question "correctly state the governing law and provide the jury with an ample understanding of the issues and applicable standards," Wittgenstein, 163 F.3d at 1168, and the district court's decision to issue these particular instructions was not an abuse of discretion.

**B**

Fredette's second challenge to the district court's jury instructions is that the district court violated his Sixth Amendment rights by failing to give a specific unanimity instruction.  "The Sixth Amendment guarantees a federal criminal defendant the right to a unanimous jury verdict."  United States v. Linn, 31 F.3d 987, 991 (10th Cir. 1994).  This court has held that the crime of mail fraud under

---

[2]  Because the jury was adequately instructed on this point, we need not consider Fredette's argument that a reasonable person would not have believed the "puffing" or "seller's talk" used by Fredette and other NFC employees. (Appellant's Br. at 27.)  We note, however, that the misrepresentations made by Fredette went far beyond mere "puffing."  Fredette attempted to pass off worthless rebate vouchers as valuable commodities, and went to great lengths to disguise the actual nature of his business.  A person of ordinary prudence cannot be expected to unravel a web of deception as complex as that spun by Fredette and his associates.

18 U.S.C. § 1341 consists of two separate but interrelated offenses: "[a]lthough largely overlapping, a scheme to defraud, and a scheme to obtain money by means of false or fraudulent pretenses, representations, or promises, are separate offenses." United States v. Cronic, 900 F.2d 1511, 1513 (10th Cir. 1990). The wire fraud statute also refers to both a scheme to defraud and false pretenses. See 18 U.S.C. § 1343.

Fredette therefore claims that the district court should have instructed the jury that they must unanimously agree that, with respect to each charge, he was guilty or not guilty either of devising a scheme or artifice to defraud or of false pretenses (or both). However, Fredette did not propose a specific unanimity instruction to the trial court. "Where, as in this case, a defendant does not request a specific unanimity instruction, we review the lack of such an instruction under the plain error standard." United States v. Powell, 226 F.3d 1181, 1194 (10th Cir. 2000) (quotation omitted).

The present case is comparable to United States v. Haber, 251 F.3d 881 (10th Cir. 2001). In Haber, the defendant was convicted of both mail fraud and wire fraud. Id. at 885. Haber sought to overturn his conviction because the indictment charged him with both a scheme to defraud and a scheme to obtain money by false pretenses, while the jury instructions permitted conviction based on either type of scheme. Id. at 888. Haber requested a jury instruction

specifically explaining that the jury must unanimously agree as to either a scheme to defraud or false pretenses, but the district court declined to give this instruction, reasoning that a general unanimity instruction was sufficient. Id. In affirming, this court noted that Haber failed to object to the allegedly duplicitous indictment prior to trial, and held that a failure to "timely challenge [an] indictment on duplicity grounds . . . waive[s] any later challenge based on a failure to use a special verdict form to avoid the alleged duplicity problem." Id. at 888–89 (quotation omitted). Moreover, concluding that there was sufficient evidence to convict Haber under either of the alternative theories, and noting that Haber did not contend there was insufficient evidence under either theory, we held that any error by the district court was harmless. Id. at 888–89.

In the instant case, as in Haber, the district court issued a general instruction that the verdict of the jury must be unanimous. We do not begin with a presumption that a general unanimity instruction is insufficient to indicate whether all jurors agreed on each individual offense. Rather, "it is assumed that a general instruction on the requirement of unanimity suffices to instruct the jury that they must be unanimous on whatever specifications they find to be the predicate of the guilty verdict." United States v. Phillips, 869 F.2d 1361, 1366 (10th Cir. 1988) (quotation omitted).

Fredette never requested a specific unanimity instruction, and hence his claim that the district court erred in not tendering such an instruction is even more suspect than in Haber. Furthermore, Fredette does not claim on appeal that the evidence was insufficient to convict him on either count. "When a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, . . . [a general] verdict stands if the evidence is sufficient with respect to any one of the acts charged." Haber, 251 F.3d at 889 (alteration in original) (quotation omitted). Ample evidence at trial showed that Fredette both devised a scheme to defraud customers and dealers and devised a scheme to obtain money by false pretenses. Accordingly, the district court's decision not to tender a specific unanimity instruction was not plainly erroneous.

## IV

Fredette also claims that the district court erred in applying a sentencing enhancement for a scheme to defraud more than one victim in conjunction with a separate enhancement for committing the offense through the use of mass-marketing. "Factual findings made at sentencing are reviewed under a clearly erroneous standard, but the district court's legal interpretation of the guidelines is reviewed de novo." United States v. Lambert, 995 F.2d 1006, 1008 (10th Cir. 1993).

At the time of Fredette's sentencing, U.S.S.G. § 2F1.1(b)(2) provided for a two-level increase in the offense level for "a scheme to defraud more than one victim," and U.S.S.G. § 2F1.1(b)(3) provided for another two-level increase for an "offense . . . committed through mass-marketing." Fredette objected to the application of both these increases on the grounds that doing so constituted impermissible double counting. The district court was not persuaded, concluding that the two enhancements "are distinct and serve different purposes." (4 R. at 103.)

> We have held that
>
> [i]mpermissible double counting or impermissible cumulative sentencing [under the Guidelines] occurs when the same conduct on the part of the defendant is used to support separate increases under separate enhancement provisions which necessarily overlap, are indistinct, and serve identical purposes. Importantly, the last three conditions are stated as a conjunctive requirement; that is, all three must be met for the use of separate enhancements to constitute impermissible double counting.

United States v. Browning, 252 F.3d 1153, 1160 (10th Cir. 2001) (alteration in original) (quotations omitted). Thus, in order to prevail, Fredette must show that § 2F1.1(b)(2) and (b)(3) necessarily overlap, are indistinct, and serve identical purposes.

We conclude that Fredette cannot establish that these two provisions necessarily overlap. Although it is usually the case that an offense that involves mass-marketing will also involve a scheme to defraud more than one victim, the

- 18 -

converse is not necessarily true. "A successful double counting claim must demonstrate that the two enhancements *necessarily* overlap in every conceivable instance, not just that they overlap often." Browning, 252 F.3d at 1160. It is not difficult to imagine a scheme to defraud three or four victims, which would trigger the § 2F1.1(b)(2) enhancement, but which does not involve mass-marketing.[3] It is not sufficient to establish that enhancement A necessarily implicates enhancement B: one must also show that enhancement B necessarily implicates enhancement A. See United States v. Rucker, 178 F.3d 1369, 1372 (10th Cir. 1999) (explaining that an enhancement for "more than minimal planning" does not necessarily overlap with an enhancement for being the leader of an extensive criminal enterprise, because one can engage in substantial planning without being the leader of the enterprise (citing United States v. Smith, 13 F.3d 1421, 1429 (10th Cir. 1994)). In this case, Fredette cannot show that both enhancements necessarily implicate each other.[4]

---

[3] The application note to § 2F1.1(b)(2) gives the example of "a wire fraud in which a single telephone call was made to three distinct individuals to get each of them to invest in a pyramid scheme." § 2F1.1(b)(2) cmt. n.4. Phone calls to three individuals would scarcely constitute "mass-marketing," but would be sufficient to trigger the § 2F1.1(b)(2) enhancement for multiple victims.

[4] Furthermore, it is not clear that § 2F1.1(b)(2) and (b)(3) serve identical purposes. As the government points out, the enhancement for multiple victims goes to the ultimate harm caused by the defendant's conduct, while the enhancement for mass-marketing concerns the scope and sophistication of the defendant's fraud. Moreover, the enhancement for cases involving mass-marketing may be designed to protect the integrity of mass-marketing mechanisms

Because the enhancements under § 2F1.1(b)(2) and (b)(3) do not necessarily overlap, Fredette cannot show that the district court's imposition of separate two-level enhancements under the two provisions constituted impermissible double-counting. We conclude that the district court's sentencing calculations were correct.

## V

Fredette's final argument is that the district court's enhancements and adjustments to his sentence violated Apprendi v. New Jersey, 530 U.S. 466, 490 (2000), insofar as they were not pled in the indictment, submitted to the jury, and proven beyond a reasonable doubt. This issue was not raised below, and accordingly we review it under the "plain error" standard. See United States v. Bailey, 286 F.3d 1219, 1222 (10th Cir. 2002).

Fredette concedes that we have held, in United States v. Sullivan, 255 F.3d 1256, 1264–65 (10th Cir. 2001), cert. denied, 534 U.S. 1166 (2002), that Apprendi does not apply to sentencing factors that increase a defendant's guideline range but do not increase the statutory maximum. Fredette's sentence in this case does not exceed the total statutory maximum. Thus, under our precedent, Fredette is not entitled to relief under Apprendi.

---

regardless of the number of persons affected. We need not decide this issue, however, as we conclude that the two enhancements in question do not necessarily overlap.

## VI

For the foregoing reasons, we **AFFIRM** the conviction and the sentence imposed by the district court.