**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 28 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

BRADLEY D. OSTROM,

    Defendant - Appellant.

No. 03-1050
(No. 98-CR-294-N)
(D. Colorado)

**ORDER AND JUDGMENT** *

Before **KELLY** , **BRISCOE** , and **LUCERO** , Circuit Judges.

In connection with fraudulent exaggeration of an insurance claim, Bradley

D. Ostrom was convicted of six counts of mail fraud in violation of 18 U.S.C.

§§ 1341 and 2, sentenced to twenty-one months of incarceration, and ordered to

pay restitution in the amount of $105,345.77 to ITT Hartford Insurance Group

---

* The case is unanimously ordered submitted without oral argument pursuant
to Fed. R. App. P. 34(a)(2) and 10th Cir. R. 34.1(G). This order and judgment is
not binding precedent, except under the doctrines of law of the case, res judicata,
and collateral estoppel. The court generally disfavors the citation of orders and
judgments; nevertheless, an order and judgment may be cited under the terms and
conditions of 10th Cir. R. 36.3.

("Hartford"). Reviewing his appeal from that judgment, we exercise jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), and affirm.

**I**

During the summer of 1995, Ostrom was employed as a Vice President by Attache, Incorporated ("Attache"), a San Diego corporation that owns and manages a residential complex, Fenton Place Apartments, located at 6900 and 7100 East Evans Avenue in Denver, Colorado.

Conradene VanWinkle, the resident manager of the Fenton Place property and an Attache employee, lived in building Unit #123A. On the evening of June 12, 1995, VanWinkle arrived at her apartment and discovered flooding. She immediately engaged plumbers to repair the problem, which was determined to have been caused by a pinhole leak in a copper pipe approximately one inch long under her kitchen sink. No other tenants complained about the incident. On the following day, June 13, 1995, VanWinkle reported the problem to staff at the Attache offices in San Diego, who in turn shortly thereafter apprised Ostrom of the situation. Ostrom flew to Denver that afternoon to address the problem. Upon his arrival, VanWinkle demonstrated the apartment damage and explained that the cause of the flooding had been repaired. Ostrom then asked VanWinkle to show him the unoccupied apartments near VanWinkle's unit, including two that were gutted and had been vacant for at least two years. During this inspection,

Ostrom told VanWinkle that he wanted the apartments to appear humid by enhancing moisture in them. Together, they turned on the showers in the apartments and let the hot water run for five to seven minutes with the windows shut. Ostrom also instructed VanWinkle to obtain spray bottles; they then proceeded to spray the walls of the units with water to make them appear as though they had been damaged.

On the following morning, before the insurance adjuster arrived, Ostrom asked VanWinkle to collaborate with him on a story regarding a former tenant, Erma Bible, who had resided in Unit #424 and had moved out sometime in April or May but left no forwarding address. They agreed to tell the adjuster that Bible had suffered from heat stroke as a result of the break in the pipe and was forced to move out immediately; the purpose of this fabrication was to make the incident appear more serious than it was. Ostrom also moved cabinets that had previously been damaged by a tenant into one of the units alleged to have been damaged by the June 12 incident.

When the adjuster arrived the afternoon of June 15, Ostrom informed him that the cause of the damage was a hot water pipe burst in the crawl space beneath VanWinkle's apartment, which released twenty to twenty-five thousand gallons of hot water at a temperature of one-hundred and ninety degrees. When the adjuster asked to be brought to the crawl space to inspect the broken pipe, Ostrom lied and

informed him that the space was full of mud and difficult to access. Ostrom claimed that twelve apartments, including VanWinkle's unit, had been affected by the burst, and that elevators had also been damaged.

On the adjuster's recommendation, dehumidifiers were placed in the apartments to capture the steam. When Ostrom discovered that the dehumidifier pans had not captured any steam and were empty, he instructed VanWinkle to fill them with water. He also directed her to falsify lease applications to show that vacant apartments had been leased, and that because of the pipe burst they were no longer suitable for occupation. Ostrom also asked Amtech Reliable Elevator Service, which had submitted a bid to repair elevators from damage unrelated to the incident, to reformat their proposal into an invoice, presumably so that he could submit it as part of his pipe-bursting claim to the insurers.

In the ensuing months, Ostrom sent various documents through the postal service to the insurance adjuster for forwarding to the insurer, persisting in his claim that a pipe exploded in the crawl space beneath VanWinkle's apartment. He requested funds for property damage to twelve apartment units and for damage to elevators alleged to have arisen from the pipe-explosion. In addition, falsely claiming that the pre-diluvian occupancy rate of the apartment building was one-hundred percent, Ostrom submitted a claim for lost rents as well. On the basis of these claims, Hartford paid a damage award of $116,690.24 to Attache. This

amount included $16,134 for the elevator repairs and $7,460 for lost rent; most of the remainder is attributable to property damage to the apartment units, including $11,335.47 to repair VanWinkle's unit.

At trial, the jury found Ostrom guilty of six counts of mail fraud arising from his use of the mail regarding this insurance claim. At sentencing, the district court calculated the amount of loss as $105,354.77, deducting the $11,335.47 for repairs to VanWinkle's unit from the total insurance payout of $116,690.24. Based on this calculation, the judge added eight levels to the base offense level of six, producing a total offense level of fourteen. The court sentenced Ostrom to a term of twenty-one months of imprisonment on each count to be served concurrently and ordered him to pay $105,354.77 in restitution to Hartford.

On appeal, Ostrom raises three arguments. First, he challenges the exclusion of defense expert witness testimony regarding the insurance policy's coverage. Second, he claims that the court erred in calculating the amount of loss for purposes of computing his offense level. Third and related to the second claim, he argues that the court miscalculated the amount of restitution. We address each claim in turn.

## II

We review the district court's exclusion of expert testimony for abuse of discretion and will reverse the decision only if it is manifestly erroneous. United States v. Fredette, 315 F.3d 1235, 1238–39 (10th Cir. 2003). "The district court has wide discretion in making these determinations." United States v. Arney, 248 F.3d 984, 990 (10th Cir. 2001) (quotations omitted).

Ostrom proffered the testimony of his expert witness, Ronald Sandgrun, to establish that under the terms of the policy, the insurer bore the responsibility to pay out any claims unless it could show that the damage was not covered. Finding that the potential for jury confusion outweighed any possible relevance, the offer was disallowed. In an attempt to connect this testimony to the materiality requirement of the criminal charges, Ostrom suggests that because the insurer did not conclude otherwise, the damages to the apartments would have been covered by the insurance policy, and the insurer would be required to pay for repairs despite Ostrom's admitted misrepresentations regarding the elevator damage and rent loss; ergo, Ostrom's misrepresentations were immaterial. We disagree.

Ostrom does not challenge the adequacy of the jury instruction describing the element of materiality: "A material fact is a fact that would be of importance to a reasonable person in making a decision about a particular matter or a

particular transaction." (Appellee's Supp. App. at 24.)   <u>See</u> <u>Fredette</u>, 315 F.3d at 1242 (approving a similar jury instruction).  Any additional testimony by Sandgrun to define "materiality" in the civil insurance context to determine whether an insurance claim would be paid in part or denied in full when the insured lies as to part of the claim would confuse the jury on the question of criminal materiality.  As to criminal materiality, the evidence clearly established that Ostrom's fabrications induced the insurer to pay his claim in full, and Sandgrun's testimony was not offered to rebut this fact.  We conclude that the district court did not abuse its discretion in finding that any added benefit of Sandgrun's testimony regarding the definition of materiality was outweighed by its potential to confuse the jury and affirm the decision to exclude it from evidence.

## III

As his second claim for relief, Ostrom maintains that the district court erred in calculating the amount of loss for purposes of determining his offense level. We review factual findings made at sentencing for clear error and the court's legal interpretation of the Sentencing Guidelines de novo.   <u>Fredette</u>, 315 F.3d at 1244.

Under the Sentencing Guidelines, the amount of loss is the greater of actual loss or intended loss.  U.S.S.G. § 2B1.1, comment n.2(A).  In conducting this

calculation, the district court found that both the actual and intended loss were $105,354.77, reflecting the amount Ostrom falsely claimed for elevator repairs, loss of rent, and property damage to the twelve units, minus $11,335.77, the amount of loss to VanWinkle's apartment.

Although Ostrom admits that he lied with regard to the elevator damage and the rent loss and concedes that the amount attributable to these was properly included in the amount of loss,   he challenges the inclusion of the amount for property damage to the other eleven apartments.  Arguing that Attache was entitled to the funds for property damage to these units, he maintains that Hartford suffered no loss in paying out this portion of the claim.  We disagree.

Even were we to accept that the damage to the apartments would have been covered under the policy in the absence of Ostrom's falsehoods, and were we to ignore the evidence that Ostrom misrepresented the property damage by spraying the apartment walls with water, running the showers, and ordering the dehumidifier pans to be filled to make the units appear to have been subject to steam damage, Ostrom admits that he lied with regard to the elevator repairs and the lost rent.  Under the following express terms of the insurance policy, these misrepresentations relieve Hartford of the obligation to pay any part of the claim:

> We will not pay for any loss or damage in any case of:
> 1.    Concealment or misrepresentation of a material fact; or
> 2.    Fraud

committed by you or any other insured ("insured") at any time and relating to coverage under this policy.

(1 R. at 41.) This language suggests that Ostrom's falsehoods regarding the elevator repairs and the lost rents forfeit any right to property damage claims in connection with the same incident.

Case law buttresses this conclusion, suggesting that the misrepresentations with respect to the elevator repairs and the lost rent, standing alone, would relieve Hartford of its obligation to pay any portion of the claim. See e.g., Amer. Diver's Supply & Manuf. Corp. v. Boltz, 482 F.2d 795, 798 (10th Cir. 1973) ("The penalty for attempted fraud in an insurance case where a fraud clause exists . . . is not simply forfeiture of the excess or inflated recovery amount but the voiding of all actual loss benefits as well."); Frontier Exploration, Inc. v. Amer. Nat'l Fire Ins. Co., 849 P.2d 887, 892–93 (Colo. Ct. App. 1992) (holding that when an insured suffers a loss but then exaggerates the claim, the insurer is released from paying any portion of the claim including the amount of actual loss); but see Fireman's Fund Ins. Co. v. Barker, 41 P. 513 (Colo. Ct. App. 1895) (suggesting that when the insured misrepresents its ownership interest in property, the insurance policy may be severed and although the insurer is relieved of its obligation to pay on the portion of the claim related to the misrepresentation, it is not relieved of its obligation to pay on the unrelated portion). We conclude that

the district court was not clearly erroneous in finding that the amount of actual and intended loss was $105,354.77 and affirm.

## IV

Related to his claim regarding the amount of loss for purposes of determining his offense level, Ostrom maintains on appeal that the district court miscalculated the amount of restitution. We review factual findings relating to a restitution order for clear error and the calculation and award of restitution for abuse of discretion. United States v. Kravchuk, 335 F.3d 1147, 1156 (10th Cir. 2003).

Under the Mandatory Victim's Restitution Act, the sentencing court must order the defendant to pay restitution to the victim in an amount equal to the actual loss suffered by the victim. 18 U.S.C. § 3663A(c)(1)(A)(ii), (a)(2), and (b)(1); United States v. Messner, 107 F.3d 1448, 1455 (10th Cir. 1997). For the reasons explained above, we conclude that the district court did not abuse its discretion and was not clearly erroneous in calculating Hartford's actual loss, and we affirm the restitution order.

ENTERED FOR THE COURT

Carlos F. Lucero
Circuit Judge