**F I L E D**

**UNITED STATES COURT OF APPEALS**

**July 25, 2006**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

CLAUDE LEFEBVRE,

    Defendant-Appellant.

No. 05-1358
(D. Colo.)
(D.Ct. No. 02-CR-485-RB)

---

**ORDER AND JUDGMENT**[*]

---

Before **TACHA**, Chief Circuit Judge, and **BARRETT** and **BRORBY**, Senior Circuit Judges.

---

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Following his waiver of a jury trial, a district court convicted Appellant Claude LeFebvre of seven counts of wire fraud in violation of 18 U.S.C. §§ 2 and 1343; eight counts of engaging in monetary transactions in criminally derived property in violation of 18 U.S.C. §§ 2 and 1957, and one count of forfeiture under 18 U.S.C. § 982(a)(1). Mr. LeFebvre appeals his convictions and sentences, contending the district court erred in: 1) failing to require the government to elect a theory of prosecution on the wire fraud counts; 2) failing to advise him, during and after his waiver of a jury trial, of his right to jury findings of fact regarding his sentence enhancement under United States Sentencing Guidelines Manual (USSG) § 2B1.1; and 3) enhancing his sentence under § 2B1.1 on the basis of an intended monetary loss of $64,850,000, rather than the actual loss in an amount under $4,000,000. We exercise jurisdiction pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291 and affirm Mr. LeFebvre's convictions and sentences.

For the purposes of this appeal, we find it unnecessary to recount in detail the scheme involved or representations made, other than to provide a general account of the nature of the scheme, some of the pertinent representations made, and the intended losses attributable to Mr. LeFebvre. To start, Mr. LeFebvre and his co-defendant, Dennis Herula, devised a sophisticated scheme to defraud wealthy investors of huge sums of money; Mr. LeFebvre and the others involved

in the scheme represented to investors that a specialized leverage trading program, authorized by the federal government, existed, in which Mr. LeFebvre could very lucratively invest their money in double-A or triple-A rated instruments for at least a 75% return per week.  Mr. LeFebvre held himself out as a licensed federal trader with the knowledge and ability necessary to trade in this specialized program; however, no such program existed and he held no federal trader's license.  As part of the scheme, Mr. LeFebvre and his intermediaries solicited individuals to invest a minimum of $10,000,000 in the program.  Based on Mr. LeFebvre's verbal and written false representations about the investment program and himself, one potential investor seriously considered investing $10,000,000, transferred $10,000,000 into a certificate of deposit, and faxed a copy of the certificate of deposit to Mr. LeFebvre at his request as proof of funds for investment, but ultimately declined to make the investment based on the advice of his attorney.  However, two Colorado investors, through their company Comet Enterprises, invested $40,000,000, and a Japanese firm invested $14,850,000.

As part of the scheme, Mr. LeFebvre and Mr. Herula opened a series of accounts at a Texas branch office of Merrill Lynch, and on or about July 2, 2002, arranged for the Comet Enterprises investors to wire their $40,000,000 investment to a designated account.  Based in part on Mr. LeFebvre's verbal representations

and written documents he presented, the Comet Enterprises investors: 1) procured a $40,000,000 treasury bill for use as margin collateral for Merrill Lynch to release funds on the account; and 2) understood their $40,000,000 investment would be used only to purchase double-A rated instruments. Based, again, in part on certain representations and advice from Mr. LeFebvre, one of the Comet Enterprises investors authorized Merrill Lynch to release money on margin in the amount of $20,000,000 to another account, on which Mr. LeFebvre and Mr. Herula had signature authority, for investment by Mr. LeFebvre in double-A rated bonds. As soon as the money moved into the second account, Mr. Herula transferred $6,000,000 to Mr. LeFebvre's and his and his wife's Merrill Lynch accounts and they began spending the money for their own purposes without authorization from the investors. In total, they spent just over $4,000,000 of Comet Enterprises' funds on items such as cars, jewelry, expensive hotels, gifts to family members, and payment of past debts. After an employee at Merrill Lynch noticed the unauthorized expenditures, Mr. LeFebvre and Mr. Herula falsely reported they used other funds to purchase the promised double-A rated bonds for the investors from a company called Bondhub, thereby allowing them to use the investors' money for their own purposes. However, no money was ever invested in any A-rated instruments on behalf of Comet Enterprises, and its investors never received any of the promised profit returns.

Meanwhile, sometime on or about July 22, 2002, Mr. LeFebvre helped persuade the Japanese firm to wire its $14,850,000 investment to a Texas Merrill Lynch account over which he, Mr. Herula, and another person retained signature authority. Again, the money was used to buy a treasury bill which could be used as security for Merrill Lynch to release money to them on margin. On July 25, 2002, an associate of Mr. LeFebvre's attempted to open an account at Merrill Lynch in Paris, France, using one of the Merrill Lynch Texas accounts opened by Mr. LeFebvre and Mr. Herula. The associate told employees at the Paris office he intended to deposit into the Paris account $4,000,000 per week for thirteen weeks and then distribute the funds to his partners. The Paris office refused to open the account and notified the Merrill Lynch New York office, which, on making inquiries, discovered a pending Securities and Exchange Commission action against Mr. Herula and his wife; it then immediately froze all of the Texas Merrill Lynch accounts associated with Mr. Herula.

Not deterred, Mr. LeFebvre directed an associate to create a document purporting that he, Mr. LeFebvre, needed to wire $10,000,000 to Germany immediately; then Mr. LeFebvre and Mr. Herula attempted to persuade Merrill Lynch to release their Texas funds because of their obligation to purchase a bond in Europe. Merrill Lynch refused. Mr. LeFebvre then attempted to persuade Merrill Lynch to open another account solely in his name in order to remove it

from the freeze on Mr. Herula's assets, which it also refused to do. During this time, the Securities and Exchange Commission commenced an investigation into Mr. LeFebvre's and his colleagues' activities, which ultimately resulted in an order freezing Mr. LeFebvre's and the other individuals' accounts. Due to the freeze on these accounts, none of the Japanese firm's funds were spent and Merrill Lynch returned its money. Later, through forfeiture, the government recovered various assets from Mr. LeFebvre and Mr. Herula, leaving the amount of restitution owed to the Comet Enterprises investors at $3,945,189.07.

In early November 2004, the district court held a hearing on Mr. LeFebvre's request to waive his right to a jury trial in favor of a bench trial and, after a lengthy colloquy with Mr. LeFebvre regarding his relinquishment of that right, granted his motion. Several months prior to trial, Mr. LeFebvre also filed a motion asserting the government must elect a theory of prosecution on the wire fraud counts, given the superceding indictment stated he devised a scheme to both "defraud" investors and obtain money by materially "false and fraudulent pretenses." In response, ten months and then six months before the trial, the government stated it intended to prove both a scheme to "defraud" and a scheme to obtain money by materially "false and fraudulent pretenses" at the trial. In later dismissing Mr. LeFebvre's alternative theory motion, the district court determined the government disclosed it would proceed on both theories in

-6-

sufficient time for Mr. LeFebvre to prepare and organize his defense in advance of trial in accordance with his due process rights, and that wire fraud, under 18 U.S.C. § 1343, creates dual theories of prosecution which are not mutually exclusive; therefore, no election was necessary between the scheme to defraud or to obtain money by false and fraudulent pretenses.

At Mr. LeFebvre's trial, the government offered overwhelming evidence to establish his guilt with respect to each count of the indictment, as well as the intended loss perpetrated under the scheme in the amount of $64,850,000, for the purpose of supporting a twenty-four-level enhancement under § 2B1.1. After considering all of the evidence presented, the district court found Mr. LeFebvre guilty on all counts charged. Based on the evidence offered, the district court also concluded the government established the scheme's intended loss was more than $50,000,000, but less than $100,000,000, for the purpose of the twenty-four-level offense enhancement under USSG § 1B1.1(b)(1)(M).

Prior to sentencing, a probation officer prepared a presentence report calculating Mr. LeFebvre's base offense level at six under USSG § 2B1.1(a)(2). The probation officer then applied a twenty-four-level upward adjustment under § 2B1.1(b)(1)(M) based on the fact the intended loss underlying the scheme was more than $50,000,000 and less than $100,000,000. Specifically, the probation

officer determined the intended loss totaled $64,850,000, which included the $10,000,000 one potential investor contemplated investing, Comet Enterprises' actual $40,000,000 investment, and the Japanese firm's actual $14,850,000 investment. After applying various other enhancements and adjustments, as well as factoring in Mr. LeFebvre's Category I criminal history, the probation officer calculated his sentencing guideline range at 210 to 262 months imprisonment.

Mr. LeFebvre objected to the government enhancing his sentence based on the intended loss figure of $64,850,000, claiming the actual loss of $3,945,189 to Comet Enterprises should apply instead, resulting in a much lower eighteen-level enhancement and a lower sentencing guideline range. At the July 2005 sentencing hearing, Mr. LeFebvre's counsel renewed the same objection and also argued for the first time that Mr. LeFebvre's jury trial waiver did not apply to findings relating to the § 2B1.1 enhancement, and, instead, those findings must be made by a jury under *United States v. Booker*, 543 U.S. 220 (2005). During this argument, Mr. LeFebvre's counsel stated she was not "speaking to the validity of that waiver at this point." Mr. LeFebvre also testified at the sentencing hearing, but rather than acknowledging any wrongdoing, responsibility, or remorse for his actions, he made insinuating, insulting, and defiant remarks about those involved in the investigation and litigation of his criminal proceeding.

The government responded to Mr. LeFebvre's and his counsel's remarks, asserting that the lack of a jury finding on the § 2B1.1 enhancement did not violate either *Blakely* or *Booker*. The government also pointed out Mr. LeFebvre's comments and attitude evidenced: 1) his failure to accept responsibility for his actions or acknowledge wrongdoing; 2) his continuing threat and danger to the public; and 3) his unlikely possibility of rehabilitation.[1] With respect to the amount of intended loss applied for an enhancement, the government recounted in detail the circumstances showing Mr. LeFebvre's persistence in attempting to transfer money out of the accounts of the investors, even after a freeze stymied his access, thereby demonstrating he did not abscond with all of the money invested only because he could not access it.

The district court considered the sentencing factors in 18 U.S.C. § 3553, the applicable advisory sentencing guidelines, the facts of the case, the applicable law, and the parties' arguments before concluding Mr. LeFebvre should be sentenced to lengthy, concurrent terms of imprisonment totaling 240 months. In so concluding, the district court considered the sentencing guidelines as advisory

---

[1] In support of a lengthy sentence, the government also suggested the circumstances surrounding Mr. LeFebvre's offenses showed they were carefully planned and artfully executed; his network of bold and willing facilitators made him a danger in the future; a substantial sentence would deter the members of his group from committing future crimes; and his age of sixty-one should not mitigate a lengthy sentence, given his advanced age is, in fact, an asset, giving him the appearance of wisdom in the area of international finance.

in nature and rejected Mr. LeFebvre's argument intended loss should not be used in calculating the sentence enhancement, concluding: 1) intended loss is the focus of the advisory sentencing guidelines, and 2) Mr. LeFebvre should not be rewarded nor his punishment mitigated merely because of intervening circumstances, serendipity, or fortuity, which saved the victims from the losses intended to be perpetrated. In applying the twenty-four-level enhancement for the $64,850,000 intended loss, the district court determined the evidence supporting such an enhancement was "essentially unrefuted."

On appeal, Mr. LeFebvre renews his claim the district court erred by: 1) failing to require the government to elect a theory of prosecution on the wire fraud counts between a scheme to "defraud" or a scheme to obtain money "by false and fraudulent pretenses"; 2) failing to advise Mr. LeFebvre of his right to jury-made findings of fact regarding the § 2B1.1 enhancement; and 3) enhancing Mr. LeFebvre's sentence on the intended loss rather than the actual loss of $3,945,189.07. For the first time on appeal, Mr. LeFebvre also asserts in a cursory one-paragraph argument, without record citation or citation to legal support, that "[t]he district court failed to engage in a sufficient colloquy with Mr. LeFebvre regarding his decision to waive his right to trial by jury," his waiver was not "knowing, intelligent, and voluntary at the time it was accepted," and his "convictions must be vacated and [the] case remanded for jury trial."

We begin by addressing Mr. LeFebvre's argument the district court erred in failing to require the government to elect between two alternative theories of wire fraud by proving *either* a scheme to defraud *or* to obtain money by false pretenses or representations. He claims such an election was necessary for him "to defend against the elements of each offense" and "in anticipation of a unanimity instruction request during trial." He also points out the district court did not rule on his motion to elect a theory until the first day of the trial but fails to provide any explanation on how this prejudiced his defense. In turn, the government assesses Mr. LeFebvre's argument as one involving denial of due process based on a duplicitous indictment charging him with two separate offenses in the same count, but contends no error occurred because, in part, it informed him both ten months and six months before the trial that it intended to prove both theories.

The indictment in this case uses language similar to the wire fraud statute at issue which requires a "scheme ... to defraud, *or* for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." *See* 18 U.S.C. § 1343 (emphasis added).[2] However, one difference is the

---

[2] We have concluded "a scheme to defraud is conduct intended or reasonably calculated to deceive persons of ordinary prudence or comprehension" and "focuses on the intended end result ... [where] affirmative misrepresentations are not essential; by contrast a scheme to obtain money by false pretenses, representations or promises focuses instead on the means by which the money is obtained and particular false pretenses, representations or promises must be

(continued...)

-11-

indictment in this case uses the conjunctive word "and" rather than the disjunctive word "or" between the scheme to defraud and to obtain money by false pretenses. In either case, it appears Mr. LeFebvre is arguing two independent grounds exist for conviction, from which the government is required to elect only one.  We disagree.

To begin, we have, as Mr. LeFebvre contends, recognized two separate offenses or independent grounds for conviction exist with respect to a scheme to defraud and a scheme to obtain money by false pretenses.  *See United States v. Cronic*, 900 F.2d 1511, 1513 (10th Cir. 1990) (holding an indictment, including both a scheme to defraud and to obtain money under false pretenses, posed separate offenses for conviction); *United States v. Clausen*, 792 F.2d 102, 105 (8th Cir. 1986) (determining an indictment under 18 U.S.C. § 1343 written in the conjunctive to include both a scheme to defraud "and" obtain money by false representations posed alternative offenses for conviction under the statute). However, this court has determined that when both a scheme to defraud and to obtain money are charged in one indictment or in a single count and are

---

[2](...continued)
proved."  *United States v. Cochran*, 109 F.3d 660, 664-65 (10th Cir. 1997) (quotation marks and citations omitted).  In other words, a scheme to defraud may include false representations but still comes within the scope of the wire or mail fraud statutes absent a false representation or regardless of how the intent to defraud manifests itself.  *See United States v. Frankel*, 721 F.2d 917, 920 (3d Cir. 1983).

connected in the conjunctive, they are not duplicitous, and it will suffice to prove any one or more of the charges. *See Troutman v. United States*, 100 F.2d 628, 631 (10th Cir. 1938)*; see also Kitchens v. United States*, 272 F.2d 757, 760-61 (10th Cir. 1959) (holding "if a statute embraces several separate and distinct acts as a crime, an ... indictment in the language of the statute alleging more than one of the statutory offenses is not duplicitous, if pleaded in the conjunctive"). Moreover, we have held that even if duplicity were an issue, any perceived problem in charging both a scheme to defraud and to obtain money by false pretenses may be cured by a jury instruction explaining unanimous agreement must be reached that the government proved, beyond a reasonable doubt, at least one or the other — i.e., either a scheme to defraud or to obtain money by false pretenses. *See United States v. Trammell*, 133 F.3d 1343, 1354-55 & n.2 (10th Cir. 1998). Even when a unanimity instruction is not given with respect to the wire fraud statute, we have held, "[w]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, ... [a general] verdict stands if the evidence is sufficient with respect to any one of the acts charged." *United States v. Fredette*, 315 F.3d 1235, 1243 (10th Cir. 2003) (quoting *United States v. Haber*, 251 F.3d 881, 889 (10th Cir. 2001)).

In this case we have no jury for the purpose of unanimity instruction concerns, and a review of the record establishes the evidence overwhelmingly

supported both grounds for conviction, which the government timely notified the defendant it intended to pursue to ensure conviction under the statute. Moreover, it is clear the district court determined the government proved either or both when it concluded "each essential element, which by law comprises wire fraud ... in violation of 18 U.S.C. Sections 1343 and 2, as charged in Counts 1 through 7 of the second superseding indictment, has been established by proof beyond a reasonable doubt." Nor do we perceive a Sixth Amendment due process notice problem. While every accused has the right to be informed of the nature and cause of the accusations filed against him in a timely manner, *see Hunter v. State of New Mexico*, 916 F.2d 595, 598 (10th Cir. 1990) (*per curiam*), in this case, Mr. LeFebvre received ample notice ten months and six months in advance of trial that the government intended to offer evidence proving both a scheme to defraud and a scheme to obtain money by false pretenses. Finally, given the advance notice Mr. LeFebvre received, he has not shown how the district court's ruling on his motion on the first day of the trial prejudiced him.

Next, we turn to Mr. LeFebvre's newly-raised, cursory argument his jury waiver was unknowing, unintelligent, and involuntary. We have made it clear that "perfunctory and cursory reference" to an issue "without citation to authority in support of a legal argument is inadequate to warrant consideration." *United States v. Almaraz*, 306 F.3d 1031, 1041 (10th Cir. 2002). Moreover, we generally

will not consider an issue raised for the first time on appeal, *see Walker v. Mather (In re Walker)*, 959 F.2d 894, 896 (10th Cir. 1992), except when, for example, failure to address the issue would result in a miscarriage of justice. *See Shoels v. Klebold*, 375 F.3d 1054, 1062 (10th Cir. 2004), *cert. denied*, 543 U.S. 1147 (2005). In this case, Mr. LeFebvre's counsel explicitly advised the district court at the sentencing hearing she was not "speaking to the validity of that waiver at this point," and Mr. LeFebvre did not otherwise raise the issue until his cursory argument on appeal. For these reasons, we decline to address Mr. LeFebvre's newly-raised argument on appeal, other than to note our review of the record, including the transcript of the waiver of jury hearing and the colloquy between Mr. LeFebvre and the district court, suggests his waiver was knowing, intelligent, and voluntary. Under these circumstances, it does not appear our failure to address the issue would result in a miscarriage of justice. To the extent Mr. LeFebvre is arguing his jury waiver was unknowing, unintelligent, or involuntary because of the subsequent issuance of *Booker* two months after he waived that right, we have held a written waiver of the Sixth Amendment right to a jury trial is not rendered unknowing or involuntary by the subsequent issuance of *Booker*. *See United States v. Leach*, 417 F.3d 1099, 1104 (10th Cir. 2005).

Next, we disagree with Mr. LeFebvre's assertion at sentencing and now on appeal that the district court improperly denied him the right to have a jury make

findings of fact regarding the § 2B1.1 enhancement, as required by *Booker*. We have generally held a defendant who waives without qualification the right to a jury trial cannot assign constitutional *Booker* error for the lack of a jury determination on facts relevant to sentencing. *See Leach*, 417 F.3d at 1104. However, we have acknowledged the same defendant may challenge the sentence for non-constitutional *Booker* error if the district judge applied the sentencing guidelines in a mandatory fashion. *See United States v. Visinaiz*, 428 F.3d 1300, 1315-16 (10th Cir. 2005) (holding "*Booker*, quite clearly, does not prohibit the district court from making factual findings and applying the enhancements and adjustments to ... [a] sentence as long as it did not view or apply the Guidelines as mandatory"), *cert. denied*, 126 S. Ct. 1101 (2006).

In this case, Mr. LeFebvre waived his right to a jury trial without qualification, thereby precluding him from challenging his sentence on grounds the district court committed constitutional *Booker* error by not affording him a jury determination on facts relevant to sentencing. In addition, because Mr. LeFebvre was sentenced after *Booker*, the district court was free to find questions of fact without running afoul of *Booker*. *See United States v. Rockey*, 449 F.3d 1099, 1104-05 n.3 (10th Cir. 2006). Even if constitutional error was at stake, the error would be harmless, given the sentencing enhancement imposed by the district court was based on factual findings amply supported by the record and

which would have been found by a jury beyond a reasonable doubt.[3]  As to non-constitutional *Booker* error, none exists.  This is because the district court considered the sentencing guidelines in an advisory capacity in making its sentencing decision.

Finally, we consider Mr. LeFebvre's contention his sentence enhancement under § 2B1.1 should be based on actual, rather than intended, loss.  "When reviewing a district court's application of the sentencing guidelines, we review legal questions de novo and any factual findings for clear error, giving due deference to the district court's application of the guidelines to the facts"; in so holding, we have concluded a district court's loss calculation, like the one made in this case, is a factual question we review under the clearly erroneous standard.  *Leach*, 417 F.3d at 1105 & n.8.

Applying our standard of review, we conclude Mr. LeFebvre's argument is precluded by the commentary to USSG § 2B1.1, this court's plain precedent in applying that guideline, and the facts contained in the record.  We begin with an examination of the applicable commentary to § 2B1.1, which explicitly defines

---

[3]  Because Mr. LeFebvre raised his *Blakely/Booker* objection in the district court, this court applies a harmless error standard of review in which the government bears the burden of proving beyond a reasonable doubt that the constitutional error was harmless.  *United States v. Calzada-Maravillas*, 443 F.3d 1301, 1306-07 (10th Cir. 2006).

"loss" for the purposes of a sentencing enhancement as the "greater of actual loss *or intended loss*." Cmt. n.3(A) (emphasis added). It further states "[i]ntended loss ... means the pecuniary harm that was intended to result from the offense, and ... includes intended pecuniary harm that would have been impossible or unlikely to occur ...." Cmt. n.3(A)(ii). While we recognize this sentencing guideline commentary is now advisory rather than mandatory under the principles announced in *Booker*, it continues to be a factor the district court must consider in imposing a sentence. *See United States v. Kristl*, 437 F.3d 1050, 1053 (10th Cir. 2006) (*per curiam*).

Second, this court has repeatedly affirmed the use of the intended loss calculation suggested in § 2B1.1 and another similar guideline applying the same loss calculation, § 2F1.1. *See Leach*, 417 F.3d at 1105-06 (applying § 2B1.1); *United States v. Lin*, 410 F.3d 1187, 1192-94 (10th Cir. 2005) (same); *United States v. Burridge*, 191 F.3d 1297, 1301-04 (10th Cir. 1999) (applying § 2F1.1, which recommends enhancements be based on the greater of either intended or actual loss); *United States v. Janusz*, 135 F.3d 1319, 1324 (10th Cir. 1998) (same). In calculating intended loss, we "focus on the amount that the scheme placed at risk, not the amount of money ... stolen." *Lin*, 410 F.3d at 1192 (quotation marks and citations omitted). The purpose of using intended loss is "to measure the magnitude of the crime at the time it was committed." *Janusz*, 135

F.3d at 1324. In calculating the amount of loss, the sentencing court "need only make a reasonable estimate of the loss," and "its reasonable estimate of the intended loss will be upheld on appeal." *United States v. Grant*, 431 F.3d 760, 762 (11th Cir. 2005) (quotation marks and citations omitted).

Next, we consider the overwhelming evidence in the record which establishes the loss Mr. LeFebvre intended to perpetrate from the scheme included the $10,000,000 one potential investor contemplated investing, Comet Enterprises' actual $40,000,000 investment, and the Japanese firm's actual $14,850,000 investment. Under these circumstances, we conclude the district court did not err in calculating and applying the total foreseeable pecuniary harm associated with Mr. LeFebvre's investment scheme in enhancing his sentence by twenty-four offense levels under § 2B1.1(b)(1)(M). Clearly, intended loss was the appropriate measure for an enhancement under § 2B1.1, and, based on the overwhelming evidence in the record, the district court's total intended loss calculation reasonably included all potential investors and the amount of money they intended to or did invest as a result of his scheme. As the district court indicated, only intervening circumstances, serendipity, or fortuity "saved victims from the losses intended to be perpetrated." Under the circumstances presented, the district court did not err in focusing on the amount the scheme placed at risk and not merely the smaller amount of money actually stolen. *See Lin*, 410 F.3d at

1192. As a result, the district court's intended loss calculation of $64,850,000 was a reasonable estimate reflecting the loss intended to be perpetrated by Mr. LeFebvre under his investment scheme.

For these reasons, we **AFFIRM** Mr. LeFebvre's convictions and sentences.

**Entered by the Court:**

**WADE BRORBY**
United States Circuit Judge